UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JULIANNE MARIE EVANS,

      Plaintiff,

vs.

NANTUCKET COMMUNITY SAILING, INC., a Massachusetts corporation, RONAN O'SIOCHRU and DONNCHA KIELY,

      Defendants.

CIVIL ACTION
CASE NO. 05-10088 MBB

## PLAINTIFF'S MOTION FOR LEAVE TO FILE CORRECT PRE-HEARING MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISQUALIFY

NOW COMES the Plaintiff, Julianne Marie Evans, and moves this Honorable Court to file a correct copy of Plaintiff's Pre-Hearing Memorandum in Opposition to the Defendants' Motions to Disqualify, which was filed with the Court on March 10, 2006. As reasons for the requested relief:

1. Due to an administrative error, a version of the Plaintiff's Pre-Hearing Memorandum in Opposition to the Defendants' Motion to Disqualify was filed which was not the final version.

2. Filing the final version of the document is in the interest of justice and no prejudice will result to any party as a result of granting the relief requested in this motion.

WHEREFORE, the Plaintiff respectfully requests that this Court grant Plaintiff leave to file the final version of Plaintiff's Pre-Hearing Memorandum in Opposition to the Defendants' Motion to Disqualify. A copy of that motion is appended hereto as **Exhibit A.** The Plaintiff regrets any inconvenience this may have caused.

            Respectfully submitted,
            the Plaintiff, Julianne Marie Evans,
            by her attorneys,

            /s/ Richard A. Gargiulo
            Richard A. Gargiulo, Esq.
            B.B.O. # 185680
            Constance L. Rudnick, Esq.
            B.B.O # 433500
            Gargiulo / Rudnick, LLP
            66 Long Wharf
            Boston, MA 02110
            (617) 742-3833 (tel.)
            (617) 523-7834 (fax)

            /s/ Steven Miller (rag)
            Steven D. Miller, Esq.
            817 S. University Drive, Suite 122
            Plantation, Florida 33324
            Tel. (954) 472-0776
            Fax. (954) 472-0875
            Florida Bar No. 508187
            Massachusetts Bar No. 560862

            /s/ Jeffrey A. Miller (rag)
            Jeffrey A. Miller, Esq.
            2424 North Federal Highway,
            Suite 314
            Boca Raton, FL 33431
            Tel. (561) 392-4300
            Fax (561) 347-7588
            Florida Bar No. 308358

CERTIFICATE OF SERVICE

I, Richard A. Gargiulo, hereby certify that this **Plaintiff's Motion for Leave to File Correct Pre-Hearing Memorandum in Opposition to the Defendants' Motions to Disqualify** was served on the following persons on this date and in the manner specified herein:

Electronically Served Through ECF on:

Thomas J. Muzyka, Esq.

DATE: March 13, 2006                             /s/ Richard A. Gargiulo
                                                 SIGNATURE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JULIANNE MARIE EVANS,

        Plaintiff,

vs.

NANTUCKET COMMUNITY
SAILING, INC., a Massachusetts corporation,
RONAN O'SIOCHRU and DONNCHA
KIELY,

        Defendants.

CIVIL ACTION
CASE NO. 05-10088 MBB

### Plaintiff's Pre-Hearing Memorandum in Opposition to the Defendants' Motions to Disqualify

Plaintiff files this response to the defendants' motions to disqualify Dr. Mann, a physician who examined her as part of an Independent Medical Examination procured by the defendant, and as a result of his opinions, has become her key witness, as well as her lawyers, Steven and Jeffrey Miller.[1]

#### Summary of Anticipated Facts

Defendants' horrible tale of treachery and deceit at the hands of Dr. Norman Mann (the "side switcher") and plaintiff's counsel (who defendants claim embarked on a mission to ferret out their deepest work product secrets and turn Dr. Mann, a loyal

---

[1] Because the legal arguments raised by these Motions are significantly fact dependant, and, because one of the key witnesses, Dr. Mann, himself the subject of one of the Motions, has not been contacted by Plaintiff with respect to issues raised by the Motion, the present response is necessarily based on facts that are known to the Plaintiff, and on evidence that she expects will be elicited at a hearing on the Motions.

member of the defense team, into Dr. Benedict Arnold) is unsupported by facts.[2] The facts as will be adduced at hearing are quite different from those alleged, and many of the "facts" as represented by defendants are based on unsupported innuendo and impermissible piling of "presumptions" that are based on underlying facts that are false. Plaintiff anticipates that the evidence will show that:

1) Dr. Mann was hired as an IME, the second in this case, well prior to suit,[3] at the suggestion of St. Paul's adjuster during settlement talks with Attorney Steve Miller, before Clinton & Muzyka were involved in the case, and not as a "hired gun" consulting expert to attack or dismantle plaintiff's case.[4]

---

[2] As argued infra, the fact that the defendants have submitted no evidence in support of their allegations, (no affidavits, no exhibits) other than unsupported general statements in its unattested to Motions is telling. Each Motion is insufficient on its face for lack of any record facts in support thereof.

[3] Attorney Muzyka's contention that on May 28, 2004, he communicated the fact that he had "retained" Dr. Mann as a medical expert appears untrue. The only communication Plaintiff's counsel received from Atty. Muzyka on that date is a letter indicating that his client had authorized him to make arrangements for the Plaintiff to travel to Connecticut and be examined by Dr. Mann. (Exhibit "A" ). In this letter, Atty. Muzyka reveals to Plaintiff's counsel that he is concerned about the nature extent and cause of the Plaintiff's asserted loss of taste. That is strikingly similar to the alleged "confidential" information imparted to Dr. Mann in September that defense counsel communicated "substantive concerns with Plaintiff's claim." Further evidence that there was no "retention" at this time (if that is of any legal significance) is the fact that it was not until September that an unnamed "defense counsel" met with Dr. Mann, (Defs' Mot. To Disq. Counsel, p. 2). Steven Miller's efforts to set up an appointment by contacting Atty. Muzyka and the Clinic following the May, 28th letter were fruitless. (His call to the Clinic was met with information that the Clinic had never heard of Julianne Evans, Nantucket Sailing or Attorney Muzyka). Eventually, the appointment was scheduled for October 2004, and the Plaintiff traveled to Connecticut for three days of testing.

[4] Dr. Mann may be the preeminent expert in America in this field. The existence of an expert who was later identified as Dr. Mann was first mentioned in a conversation between Steven Miller and a St. Paul's adjuster, Joshua Kaufman, in March 2004, while the two were trying to find a way to settle the case. The Plaintiff had already been the subject of an IME in June 2003, performed by Dr. Paul Flaten, who confirmed that Plaintiff's loss of taste and smell was caused by the Nantucket boat accident and is most likely permanent. St. Paul posited it could not properly evaluate the case for settlement, Joshua Kaufman said, based on the Dr. Flaten report. Kaufman reported that he had become aware of a doctor at a respected university who had developed a reliable and objective testing protocol that would answer, once and for all, St. Paul's concerns. He suggested, and it was Steven Miller's impression, that if Ms. Evans agreed to undergo a second IME (this one taking 3 days 1500 miles from her home) and if the prognosis was the same, that settlement talks would commence. Believing that a confirmation of Dr. Flaten's report would get the case settled and wanting, herself, to know for sure what her fate was, plaintiff agreed to go to the

2) Dr. Mann was not represented by a lawyer in this matter.

3) It would have been unreasonable for any defense lawyer to think that anything he/she said to Dr. Mann, under these circumstances, would not have been fair game for disclosure to opposing counsel when he was deposed as a testifying expert.[5]

4) Dr. Mann and his team conducted three days of objective testing concerning the Plaintiff's alleged loss of taste and smell. One member of the team even prescribed a prescription for nasal symptoms, and urged the Plaintiff to follow up with them. On October 29, 2004 he issued the first of several reports concluding that the Plaintiff's complaints were objectively confirmed.[6]

5) From the moment plaintiff filed the lawsuit in January 2005, the Plaintiff intended to rely exclusively on Dr. Mann and his opinion to establish her loss and causation and the defendants knew this. Plaintiff's counsel spoke to Attorney Muzyka about this fact and representations to that effect were made very clear in the papers filed

---

University of Connecticut to be examined by Dr. Norman Mann and his world renowned team at UCONN's Taste and Smell Center.

[5] This point is critical, since as a testifying as opposed to consulting or dismissed expert, nothing the retaining attorney provides to the expert, whether confidential, privileged, or work product, is beyond the scope of questioning at a deposition. In short, with a testifying expert, there is no such thing as "confidentiality." See *Suskind v. Home Depot Corporation*, 2001 WL 92183 (D. Mass. 2001) *Fibermark, Inc. v. Merrimac Paper Co., Inc.* Dkt. Entry #31, No.01-11159-DPW (D.Ma. 2002)(Bowler, M.J.)

[6] Dr. Mann also issued reports dated November 10 and November 12, 2004. It is not clear why he wrote the November 12 report, which appeared to relate to a review of additional medical records. echoed the first report that Plaintiff's loss was both caused by the July 2002 Nantucket boat accident and was permanent in nature. The November 12 report seems to have been written in response to a request by St. Paul's lawyers for Dr. Mann to consider additional medical records that they had not earlier provided. His opinion remained unchanged.

3

with the court and in open court and defendants never voiced any objection, nor could they have under the law.[7]

6) Defense counsel knew full well that Attorney Miller was in contact with Dr. Mann to arrange for his deposition.[8]

7) Plaintiff had nothing to gain by having Dr. Mann "change his opinion", as it was totally favorable to and supportive of her position and was the foundation of her case,

8) Steven Miller never asked Dr. Mann about defense strategy or secrets and none were offered (Steven Miller was not interested and Dr. Mann had none to give),

9) Plaintiff's decision to pursue her best claim, the loss of taste and smell, and to waive her soft tissue injury claims, was made <u>before</u> the November 4, 2005 status conference, was reported to the court and defendants in writing (see the November 3, 2005 Status Report) and in open court, well in advance of the January 6, 2006 meeting between

---

[7] See *Fitzpatrick v. Holiday Inns*, 507 F. Supp. 979 (E.D.Pa. 1981), *Crowe v. Nivison*, 145 F.R.D. 657 (D.Md. 1993), Easton, "Red Rover, Red Rover, Send That Expert Right Over": Clearing The Way For Parties To Introduce The Testimony Of Their Opponents' Expert Witnesses, 55 S.M.U.L.R. 1427 (Fall, 2002).

[8] The facts on this are set forth in detail in Plaintiff's response to the defendants' motion for protective order re: Dr. Mann's deposition, and will not be repeated in detail here. Suffice it to say that during the month of November, following the Status Hearing at which this Court said the Plaintiff's deposition should be taken in December, the Expert's in January, Plaintiff's counsel made many attempts, by letter, e-mail and phone, to contact defense counsel to set up a date. Defendants' counsel did not respond to any of these communications, necessitating the unilateral scheduling of Dr. Mann's deposition, which was the subject of the Motion for a Protective Order in January. The only communication Plaintiff's counsel received from the defendants' lawyer was one in which he suggested the end of February. Since these Motions to Disqualify shortly followed the Court's ruling on the Motion for a Protective Order, Dr. Mann's deposition has not been scheduled. Plaintiff wishes to confirm to the Court that it has always been her position to cooperate completely with defendants' requests and to expedite this case for trial. As far as the defendants' claim the they authorized Plaintiff's counsel to confer with Dr. Mann for scheduling purposes only is false. Plaintiff's counsel took it upon himself to contact Dr. Mann as early as October 2005 to schedule his deposition, not the contrary as suggested by Muzyka. Plaintiff's counsel kept Muzyka informed of his contacts with Dr. Mann. At no time did Atty. Muzyka restrict Plaintiff's counsel in any way.

Steven Miller and Dr. Mann. Defendants' claim that Plaintiff got Dr. Mann to change his opinion on January 6, 2006 and then, once that was done, to abandon the soft tissue injuries and go with the loss of taste/smell claim is a knowingly false representation of the facts

10)  Contrary to the defendants' allegations that Dr. Mann came up with a new opinion after speaking with plaintiff's counsel, Dr. Mann merely <u>confirmed</u> his earlier opinion in his supplemental report stating that his "impression remains **the same** as originally stated." (emphasis added)

Argument

<u>I. Defendants Motions to Disqualify are Unsupported By Facts or Law, and Should be Denied.</u>

Simply stated, the defendants' Motions to Disqualify have no basis in fact or law. Because Motions to Disqualify Counsel can be used as an abusive tactic, many courts look upon them with disfavor. *See Essex Chemical v. Hartford Accident and Indemnity*, 993 F. Supp. 241 (D.N.J. 1998), *Guerilla Girls v. Kaz*, 2004 WL 2238510 (S.D.N.Y. 2004, October 4, 2004).[9] Thus, it is axiomatic that the burden in a Motion to Disqualify Counsel is on the moving party.[10] *Lacroix v. BIC Corp.*, 339 F.Supp.2d 196 (D.Ma. 2004)(consulting expert for *BIC* in a products liability case allowed to be expert for plaintiff in separate products liability case <u>against</u> *BIC*, even though expert signed a

---

[9] The same can be said for disqualifying an expert. See *Palmer v. Ozbek* 144 F.R.D. 66, 67 (D.Md. 1992).
[10] It is clear that even when the moving party is the one who wants to allow the expert to stay on (when, for instance, the party who first retained the consulting expert learns that opposing counsel has hired him/her and lodges an objection, fearing that confidential work product will be divulged, but does not file a formal motion to disqualify; but wanting a resolution sooner, not later, and the non objecting party moves to overrule the objection) brings the matter to the court's attention, it is the objecting party who bears the burden of proof. *City of Springfield v Rexnord Corp.*, 111 F. Supp.2d 71 (D.Mass. 2000)(an objecting party has the burden of proving that there exists a conflict of interest warranting disqualification

5

non disclosure agreement; in a "side switching" claim the burden lies with movant to establish a confidential relationship "sufficiently substantial" to make disqualification or some other judicial remedy appropriate.) Every case cited by defendants supports that position.[11] Furthermore, a party must support its contentions with concrete evidence, not speculative, hypothetical or unsupported allegations." *In re: Malden Mills Industries*, 275 B.R. 670, 673 (Bankr.Mass., 2000). That court denied a motion to prevent disqualification noting that the objecting party had the burden of proof, and its response was "unsupported by any affidavits, is full of conclusory remarks [and that there is] nothing in the [papers] to support disqualification under any of the tests. The thrust of the ... argument is that [the expert] is or was their expert and cannot now switch sides." The court continued, the objecting party "asks the Court to infer the existence of a confidential relationship between [the expert] and themselves but they took no steps to ensure [the expert] understood the existence of any relationship with [them]. Id. at 674. The court declined to disqualify the expert. *See also Conte v. Lawless*, 2005 WL 2436211 (Del.Super., September 29, 2005.)

The defendants' Motions are similarly unsupported by any record evidence on the core issues, no affidavits or exhibits have been filed in support and the Motions themselves are unsworn. Accordingly, they should summarily be denied, as well.

If this Court elects to review the Defendants' claims on the merits, notwithstanding the lack of evidence, the Plaintiff asserts that the result should be the same: the Motions should be denied. Defendants' claim that both Plaintiff's long-time

---

[11] See e.g., *In re: Malden Mills Industries*, 275 B.R. 670, 673 (Bankr.Mass., 2000), Paul v. Rawlings, 123 F.R.D. 271 (S.D. Ohio 1988). The latter case espoused a two-part test and set forth what it takes, at a minimum, to satisfy it (was it objectively reasonable for the party seeking disqualification to believe a confidential relationship existed between that party and the expert, and if so whether the party seeking disqualification actually disclosed confidential information to the expert?)

6

counsel and an expert who will testify as to the nature and permanence of her condition should be disqualified finds no support in either of defendants' grounds, that is that he was a person represented by counsel under M.R.Prof.C. 4.2, or that plaintiff's attorney convinced him to divulge unspecified, unverified confidential information.

A. An expert witness is not a person represented by counsel under 4.2

The Defendants have adduced absolutely no evidence that Dr. Mann was represented by any counsel at the time he was contacted by Plaintiff's lawyer, nor can they. Therefore, ex parte contact was not prohibited by Rule 4.2, which prohibits such communication with a person KNOWN to be represented by counsel.[12] He did not have his own lawyer. And, it is well accepted that an expert is not the client of the party's lawyer any more than any other witness is the client of the lawyer who desires to call him. See Steven Easton, Can We Talk?: Removing Counterproductive Ethical Restraints Upon Ex Parte Communication Between Attorneys And Adverse Expert Witnesses, 79 Ind. L. J. 647, 678 (2001), citing Lubet, Expert Witnesses: Ethics and Professionalism, 12 Geo. J. Law & Ethics, 465, 485 (Spring, 1999)( "Retaining counsel is not the [expert] witness's lawyer.... Since the expert is not a party to the case, the expert is not represented by either of the attorneys.")

In this case, defense counsel's representation of Dr. Mann would cause further problems, because the witness at all times held the opinion that the Plaintiff suffered from damage to her senses of smell and taste, as a result of the injury she received at the

---

[12] The cases cited by the defendant respecting this rule are clearly inapposite. *Messing Rudavsky v. President and Fellows of Harvard*, 436 Mass.347 (2002) addresses the categories of corporate employees who are deemed to be represented by the corporation's lawyer for the purposes of this rule.

hands of the defendants, a position wholly adverse to the defendants' position.[13] Under those circumstances, defense counsel would be in a concurrent conflict, in violation of Mass. R. Prof. C. 1.7.

B.  The defendants have submitted no evidence to support their bald assertion that they shared confidential information with the witness, or that the witness shared confidential information provided to him by defense counsel with the Plaintiff's lawyer.

The defendant's second argument, that Dr. Mann, in effect, "switched sides" in that Plaintiff's counsel induced him to share confidential information and/or alter his testimony is similarly groundless.

Again, the cases relied upon by the defendants are inapposite. This is not a case involving "switching sides," that is, where an adversary scoops up a party's former expert, with whom the opposing party had merely consulted, or had retained but jettisoned in mid-case.[14] The policy behind restricting a party's ex parte contact with the other side's expert resides in the desire to prevent a party from obtaining confidential information from the opponent's expert. Thus, "to resolve a motion to disqualify an expert in cases other than where an expert has clearly switched sides, the court undertakes a two-step inquiry. The court must determine whether, (1) it was objectively reasonable for the moving party to believe that it had a confidential relationship with the expert; and (2) whether the moving party disclosed confidential information to the expert that is relevant to the current litigation." *LaCroix v. BIC*, 339 F.Supp.2d 196, 199-200

---

[13] Defendants make much of an allegation, again, unsupported by anything more than an averment in the Motion, that a Supplemental Report, issued following Attorney Miller's contact with Dr. Mann, "expresses an opinion" not previously submitted to defense counsel. (Mot. to Disq. Dr. Mann, p. 6). In fact, the Supplemental Report clearly states that "My impression remains the same as originally stated, that the plaintiff sustained right-sided anosmia and left-sided hyposmia due to her head injury. It is my feeling that the losses are permanent."(Mann letter to S. Miller, Jan 7, 2006)(Copy attached and marked Exhibit "B").

[14] Such was the case in *Cordy v. Sherwin Williams*, where the plaintiff's expert, after opining that the plaintiff had no case, resigned and went to work for the defendant.

8

(D.Ma. 2004) [internal cites omitted]. Finally, a court should "also balance[] competing policy objectives and consider[] concerns of fundamental fairness. [cite omitted]." *BIC* at 200.[15]

The Plaintiff suggests that the evidence likely to be adduced at the hearing will support a negative response to both. Dr. Mann apparently met no more than twice with a representative of the defense, once just a month ago, after the ex parte communications came to light. The first lasted, by the defense's own admissions, only one hour. There is no evidence in the defendants' papers or elsewhere that they communicated with the witness in any other form other than these two meetings, which occurred eighteen months apart. There will be no evidence Dr. Mann signed a confidentiality agreement, or received any documents that were not medical records whose release was authorized by the Plaintiff. The characterization of Dr. Mann is inescapable. He is not an expert (of the kind which is the subjects of most of the motions to disqualify) who is an integral or significant part of the "defense team," whose opinions, knowledge and advice informed the defendants' trial strategy. Dr. Mann was an IME who examined the Plaintiff, during settlement negotiations, before the suit was filed, at the behest of the defendants.[16] The

---

[15] Both the *BIC* and *Malden Mills* cases cited *Paul v Rawlings Sportings Goods*, 123 F.R.D. 271 (S.D.Ohio 1988), cited by defendants in their Motions, in discussing the factors a court should consider in deciding whether a confidential relationship exists between a party and its expert, including "whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial...other factors include whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the 'retaining party'."

[16] Although this IME was conducted prior to suit, and was therefore technically, not subject to F.R.Civ.P. 35, nonetheless, the fact that discovery conducted pursuant to this Rule is different from other kinds of discovery. For example, a report issued by the physician must be turned over to the patient's lawyer, whether or not it would be discoverable pursuant to other provisions. Additionally, there are some

defense recommended the Expert, in an effort to satisfy their needs, pre-suit, with respect to whether to settle the case.[17] They paid his fees, and provided him with medical records. Nothing more. Now, the defense is attempting to characterize Dr. Mann as an integral part of its team, rather than as a neutral and independent medical professional. Having been confronted with his adverse opinion, defendants now attempt to prevent the Plaintiff, who voluntarily underwent not one but two IMEs in an effort to convince the defendants of the merits of her claim, from relying on this witness.

    C. It would be patently unfair to disqualify plaintiff's counsel (and her star witness), who acted in good faith at all times

Plaintiff's lawyers have had significant experience in handling personal injury cases and in federal court matters and fully understand their ethical obligations and the tactics of insurance companies to delay paying legitimate claims. What should not be lost here is that the two real parties in interest here are the Plaintiff, who through no fault of her own, got struck in the head and suffered a serious injury as a result (now confirmed twice by separate IME examinations by doctors selected by St. Paul) and the insurance company that issued a liability insurance policy covering the event, St. Paul.

St. Paul and the Muzyka law firm have known since Dr. Mann's report was produced that if the case was ever tried Ms. Evans would introduce it in her case in chief. Plaintiff alerted the court as well, in writing and in open court. Never and at no time was nary a peep uttered in opposition (not that it would have mattered, as there is nothing to prevent plaintiff's use of an IME report or the doctor's testimony about his/her opinion).

---

jurisdictions that permit the patient's counsel to be present at the examination to insure fairness, which would necessarily create the ex parte contact the defendants condemn as a violation of ethics and law. *See e.g. Kutner v. Urban*, 2003 WL 22792239 (Sup. Ct. Ma. Nov. 24, 2003).

[17] As Atty. Muzyka's letter of May 28, 2004 indicates, the value of Dr. Mann was that he had objective testing protocol to evaluate the Plaintiff's condition.

Case 1:05-cv-10088-MBB    Document 41-2    Filed 03/13/2006    Page 11 of 15

Plaintiff produced her medical records to St. Paul before suit was filed. She cooperated in every way possible and in each and every instance where they requested anything from her, including providing a sworn statement, she cooperated. She submitted herself to St. Paul's chosen IME doctor in Ft. Lauderdale whose report confirmed her belief that her loss was likely permanent caused by the Nantucket boat accident. That was in June 2003, almost a year after the accident occurred. It took prodding from plaintiff's lawyer, Steven Miller, to St. Paul's inside adjuster, Joshua Kaufman for St. Paul to dust off the claim and give it consideration after it sat for almost a year after that. And it was Joshua Kaufman, in settlement dialogue with Steven Miller in or about March 2004 who suggested that UCONN had a renowned doctor and objective testing and whether, before bona fide settlement talks commenced, Ms. Evans would submit to testing there. She agreed, believing that would bring resolution of her case one step closer.

This court is well aware of plaintiff's efforts to move the case along, including suggesting that it be handled by a Magistrate Judge (those cases usually move faster) and waiving a jury trial (never have either of Plaintiff's attorneys waived a client's right to a jury trial in a personal injury case, but here, liability was so well documented and damages/causation established conclusively by a world renowned unbiased expert, that it was believed that any reasonable person would look at the facts and make a reasonable and substantial award). St. Paul, the real party in interest, was about delay and did not cooperate.

The rules of procedure talk in terms of being administered to secure the just, speedy, and inexpensive determination of every action. Using Dr. Mann's opinion is

11

consistent with that. Plaintiff sought Dr. Mann's deposition not for discovery purposes or to prepare for a cross examination, but, rather, to perpetuate it and to authenticate his reports. (It has been found that IME reports of testifying doctors are adoptive admissions of defendants. See *Kreppel v. Guttman Breast Diagnostic Inst.*, 1999 WL 1243891, at 1 (S.D.N.Y. Dec. 21, 1999)).

Steven Miller is a member of the Massachusetts Bar and is familiar with the ethics rules. Nevertheless, and out of an abundance of caution, he consulted the M. R. Prof. C. to confirm that none prohibited the proposed conduct.[18]

The Federal Rules of Civil Procedure were also consulted, as was First Circuit and District of Massachusetts case law and there was no law found that stated that a lawyer could not contact an expert witness of any kind, let alone a physician who examined the lawyer's client, hired by the other side. As stated, there is also no law in this jurisdiction preventing plaintiff from calling Dr. Mann or using his opinion in her case in chief. So there should be no prohibition on a party treating that witness as her own under these circumstances.

Dr. Mann apparently did not see himself as being on the defense "team" because he invited Steven Miller to his home and voluntarily talked about Ms. Evans, her injuries, medical causation and articles the doctor had written and published. Steven Miller asked the doctor about additional medical records that St. Paul had, but did not show him, and if

---

[18] See Easton, Can We Talk?: Removing Counterproductive Ethical Restraints Upon Ex Parte Communication Between Attorneys And Adverse Expert Witnesses, 79 Ind. L. J. 647, 678 (2001), (Acknowledging that nothing in the Rules adopted in most jurisdictions prohibit contacting an unrepresented witness, including an expert, advocating strongly that these informal contacts promote fair and expeditious discovery, more so than under the traditional forms expressly stated under the Federal Rules). After having been accused in open court of having committed an ethical breach, Atty. Miller called the Board of Bar Overseers hotline to determine if he had committed a breach of ethics. After explaining the situation to Assistant Bar Counsel Dorothy Anderson, she confirmed Miller's belief that no ethical breach had been committed.

they might affect his earlier opinion is not a bad thing. Plaintiff intended to rely on the Doctor as her witness even if he was jettisoned by the defendants. That is being a good lawyer and preparing yourself for the deposition of your key witness. And all of this would have come out at deposition.

Since there is no rule prohibiting talking to the IME expert hired by an opposing party, the expert was not represented in the matter, voluntarily spoke to counsel, did not consider himself possessed of defense secrets as he looked at himself as a neutral independent medical examiner and the rules actually prohibit counsel from instructing him not to talk to Ms. Evans' counsel, and for all the other reasons mentioned, Steven Miller spoke to Dr. Mann. He acted reasonably and responsibly and as a good lawyer should. He did nothing wrong, sinister or untoward. The defendants' Motions have no legal or factual support and should be denied.

Respectfully submitted by her Attorneys,

/s/ Richard A. Gargiulo
Richard A. Gargiulo, Esq.
B.B.O. # 185680
Constance L. Rudnick, Esq.
B.B.O # 433500
Gargiulo / Rudnick, LLP
66 Long Wharf
Boston, MA 02110
(617) 742-3833 (tel.)
(617) 523-7834 (fax)

/s/ Steven Miller (rag)
Steven D. Miller, Esq.
817 S. University Drive, Suite 122
Plantation, Florida 33324
Tel. (954) 472-0776
Fax. (954) 472-0875
Florida Bar No. 508187

Massachusetts Bar No. 560862

/s/ Jeffrey A. Miller (rag)
Jeffrey A. Miller, Esq.
2424 North Federal Highway,
Suite 314
Boca Raton, FL 33431
Tel. (561) 392-4300
Fax (561) 347-7588
Florida Bar No. 308358

CERTIFICATE OF SERVICE

I, Richard A. Gargiulo, hereby certify that this **Plaintiff's Pre-Hearing Memorandum in Opposition to the Defendants' Motions to Disqualify** was served on the following persons on this date and in the manner specified herein:

Electronically Served Through ECF on:

Thomas J. Muzyka, Esq.

DATE: March 10, 2006                             /s/ Richard A. Gargiulo
                                                  SIGNATURE

14