UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-10088-MBB

JULIANNE MARIE EVANS
    Plaintiff,

VS.


NANTUCKET COMMUNITY SAILING, INC.,

RONAN O'SIOCHRU and DONNCHA KIELY
Defendants

### DEFENDANT'S TRIAL BRIEF

Now come the defendants, Nantucket Community Sailing, Inc., Ronan O'Siochru, and Donncha Kiely, in the above captioned action, by and through their undersigned counsel, Clinton & Muzyka, P.C., and respectfully submit their Trial Brief.

I.    **STATEMENT OF THE CASE**

**SUMMARY**

This action arises out of an alleged injury sustained by the plaintiff on July 5, 2002 while engaged in an informal sailboat race.  The plaintiff was aboard a sailboat (14 ft. in length), owned by Nantucket Community Sailing, Inc. and piloted by Ronan O'Siochru when she was struck by the boom from a second sailboat, also owned by Nantucket Community Sailing, Inc., but piloted by Donncha

Kiely.  The boom struck the plaintiff on the back of her neck.

## INCIDENT

On Wednesday, July 3, 2002, Nantucket Community Sailing, Inc. [hereinafter referred to as NCS] placed an advertisement in The Inquirer and Mirror, the local newspaper on Nantucket, Massachusetts.  The advertisement read:

> **SAILING**: *Nantucket Community Sailing will offer Friday night races in Lasers and Hunter 140s for people of all ages who know how to sail and are interested in being involved with racing.  Races are open to the public, but are bring your own boat, though NCS does have a few Lasers available for its members.  The race series will begin this Friday evening and continue through Labor Day.  Activities will begin at 5:30 p.m.  NCS is now accepting registration for their Adult Instructional Sailing and Open Sailing programs.  For information, or to register, call (508) 228-6600, or check* www.nantucketcommunitysailing.org.

In response to reading this advertisement in the local Nantucket newspaper, the plaintiff telephoned NCS on or about July 5, 2002.  She inquired about sailing with the club.  During the telephone conversation with NCS, the plaintiff learned about the sailing race to be held on Friday, July 5, 2002.  NCS was also sponsoring a barbeque at Jetty's Beach at 8:00 p.m.  The plaintiff was informed

that NCS staff would be at the beach at 5:00 p.m. and invited her to attend.

On Friday, July 5, 2002 at approximately 5:00 p.m. the plaintiff arrived at Jetty's Beach. She met Darragh Connolly, an NCS supervisor, who introduced her to the defendant, Ronan O'Siochru. During the initial conversation with the plaintiff, O'Siochru understood that the plaintiff knew the principles of sailing and knew how to sail, but that she had not sailed for some time. Upon meeting the plaintiff, O'Siochru knew that that a race was scheduled because NCS advertised the event in the local newspaper as the Friday Night Races and it was a designed initiative for sailboat racing.

After O'Siochru and the plaintiff met, she put on life vest and they set off in one of NCS's 14' Hunter 140s. Thereafter, they sailed off Jetty's Beach for some thirty [30] minutes before the start of the race. O'Siochru manned the tiller and mainsheet while the plaintiff attended to the jib sheets. These controlled the jib sail positioned at the front of the mast.

During this pre-race period, O'Siochru observed that the plaintiff was not as mobile as he expected. The plaintiff failed to move smoothly from side to side under the boom when the sailboat tacked. O'Siochru suspected

that the plaintiff "overrepresented her sailing abilities" during their earlier conversation on the beach.

Approximately six [6] sailboats were involved in the informal race. Each boat was crewed with at least one NCS staff person. The race course was set in a triangular pattern with three [3] buoys or markers, moored some one hundred [100] meters apart. Connolly observed the race while piloting a Boston Whaler, an outboard powered boat with a center control console. Connolly positioned the Boston Whaler at the starting line of the race and sounded a horn starting the race.

The six [6] sailboats began the race. O'Siochru and the plaintiff participated in the race for some ten [10] minutes when their boat approached a marker after executing a dog leg reach from the previous marker. At this time, the plaintiff was sitting on the port side of the boat while O'Siochru was sitting on the port transom. The boat's sails and boom were on the starboard side at this time.

As O'Siochru and the plaintiff's boat approached the marker, a second sailboat on a starboard tack piloted by Donncha Kiely approached their boats from the port side. Since the plaintiff was seated on her boat's port side, the plaintiff's back was to Kiely's boat as it approached.

However, she was able to see the other boat and its two person crew when she turned to her left.

As both boats approached the marker, Kiely and O'Siochru yelled to one another discussing the boats' rights of way.  Since Kiely's boat was on a starboard tact, he believed that he had the right of way.  O'Siochru believed that his boat was permitting Kiely's boat sufficient space so that both boats could round the marker without colliding.  Kiely believed that the boats were coming close to each other as they approached the marker and the boats' hulls may eventually collide.  He believed that there was sufficient room for his boat to safely jibe and open up the distance between the boats.  Kiely then jibed his boat.  This caused its boom to swing from its port side to its starboard side.  Kiely was unaware that the plaintiff on O'Siochru's boat was within the swing of the boom.  The boom from Kiely's boat allegedly struck the plaintiff in the back of her neck.

Immediately after the boom struck the plaintiff, O'Siochru dropped out of the race and assisted the plaintiff.  Kiely called for Connolly's assistance with the Boston Whaler.  While she was lying in the boat's cockpit, the plaintiff spoke to O'Siochru in a whispering tone.  Connolly piloted the Boston Whaler to O'Siochru's

boat's location, secured a line to the Hunter 140, and towed the boat to the beach.

At 6:41 p.m., paramedics arrived at Jetty's Beach. The plaintiff was lying in the Hunter 140 with O'Siochru supporting her head.  The plaintiff notified the paramedics that she may have lost consciousness when she was hit in the back of the neck by a sailboat boom.  The paramedics provided the plaintiff with a cervical collar, secured her in a supine position to a backboard, and removed her from the sailboat.  She was placed in a vehicle, driven off the beach to an ambulance, and transported to Nantucket Cottage Hospital where she arrived alert and oriented at 7:07 p.m.

### MEDICAL TREATMENT AND EXAMINATIONS

At Nantucket Cottage Hospital the plaintiff complained of neck pain.  X-rays of the cervical spine and CAT SCAN of the head were negative.  The plaintiff was advised to rest, ice the affected area, and given prescriptions for Motrin and Percocet for pain.  After being discharged from the hospital, the plaintiff returned to her cottage on Nantucket on the evening of the alleged incident.

From the date of injury on July 5, 2002 until September 18, 2002, plaintiff did not seek any follow-up medical treatment for any cervical or lumbar spine pain.

On December 16, 2002, Alfred DeSimone, M.D., a neurologist in Florida reports a diagnosis that the plaintiff has post traumatic cervicalgia/lumbago. She reported to Dr. DeSimone that during the course of her symptoms, *she lost some of her sense of smell*. This was the first time she reported this condition to a physician.

In January 2005, the plaintiff commenced this civil action by filing a Complaint with this Honorable Court.

On July 28 & 31, 2006, the defendants' medical expert, Robert I Henkin, M.D., examined the plaintiff at the Center for Molecular Nutrition and Sensory Disorders – Taste and Smell Clinic in Washington, D.C. Dr. Henkin has studied taste and smell disorders since 1957. He is the Director of the Taste and Smell Clinic.

The examinations revealed that the plaintiff suffers from hyposmia [exceptionally weak smell] and hypogeusia [abnormally weak taste]. She also has a history of allergies to cat and algae. It was also found that the plaintiff was experiencing phantom odors, suffering from severe hypothyroidism, and Charcot Marie Tooth disease.

During this examination, it was learned that the plaintiff was diagnosed at an early age with Charcot Marie Tooth Disease, a neurological disease causing deformities within her feet.

In respect to causation, Dr. Henkin will opine that the plaintiff's hyposmia [exceptionally weak smell] and hypogeusia [abnormally weak taste] may be related to the neck trauma and her hypothyroidism and possibly her Charcot Marie Tooth disease.

At the conclusion of Dr. Henkin's examination, he proscribed Synthroid to treat the plaintiff's hypothyroidism.  In November 2006, the plaintiff reported to her medical expert, Dr. Alan Hirsch, that taking the Synthroid slightly improved her smell and several of her other medical complaints, such as general muscle pain.

## II.   ASSERTED CLAIMS & DEFENSES

### The Plaintiff's Allegations

The plaintiff alleges that NCS had a duty to provide her with "a safe leisurely sailing experience" and the plaintiff was not advised that she was going to be involved in a race and she did not consent to being in a race.  *See ¶13 of the Amended Complaint.*

The plaintiff alleges that O'Siochru and Kiely had a duty of care to not injure the plaintiff during the race. *See ¶14 of the Amended Complaint.*

The plaintiff alleges that O'Siochru breached his duty of care to the plaintiff by failing to yield and give way when Kiely had a clear right of way. *See ¶15 of the Amended Complaint.*

The plaintiff alleges that her injuries were proximately caused by O'Siochru and Kiely both of whom were under the direct supervision and employ of NCS. *See ¶16 of the Amended Complaint.*

**Defenses**

This action is controlled by the Federal substantive General Maritime Law of the United States.

The defendants contend that neither O'Siochru nor Kiely breached any duty owed to the plaintiff who willingly participated in the informal sailboat race on July 5, 2002.

The defendants state that if the plaintiff sustained personal injuries as alleged, which is specifically denied, it was due to O'Siochru's and Kiely's errors of operational judgment for which, under the General Maritime Law, there is no legally responsible.

The defendants also state that if the plaintiff was injured as alleged, which is specifically denied, it was due in whole or in part to her own negligence and failure to exercise a reasonable degree of care and not due to any negligence or fault on the part of the defendants nor any person or persons for whom the defendant may be legally responsible.  The plaintiff knew or should have known that she was participating in a sailboat race and that Kiely's boat was in close proximity to her boat.  The plaintiff failed to keep a proper lookout for her own safety.

The defendants also state that the cause of the plaintiff's complete loss of taste and partial loss of smell is attributed to several other conditions including the plaintiff's allergies, her hypothyroidism, and possibly her Charcot Marie Tooth disease.

The defendants state that the post injury actions and boat navigation were pursuant to plaintiff's authorization and request and not in violation of any applicable law and/or regulation.  After the plaintiff was struck by the sailboat boom, she required medical attention.  The defendants towed the boat to Jetty's Beach in order to expedite her medical attention.

NCS states that if the plaintiff was injured as alleged, which is specifically denied, such injury was without the fault, knowledge, or privity of NCS; that the damages claimed herein exceed the value of each boat, including their pending freight; and NCS herewith claims benefit of any and all laws and statutes of the United States of America, including but not limited to, Limitation of Liability of NCS, 46 USCA, Appx. § 183 (b) for each boat. The Hunter 140s involved in the alleged incident had a fair market value of $4,320.00 each.

NCS is a charitable organization for purposes of MGL c. 231, § 85K and thereby is entitled to charitable immunity and cap its liability at the level of $20,000.00.

III. <u>ERROR OF JUDGMENT</u>

Where the questions are merely those of prudential rules of navigation and of maritime usages, a boat should not ordinarily be held in fault simply because the courts, with cool deliberation, after all the facts, determine that what was done was mistaken. In such cases a court should put itself in the position of the master at the time of the circumstances involved, and consider that the rights of the parties, when maritime contingencies are difficult and unusual, must ordinarily be settled according to his determination, provided he has suitable experience and capacity, and exercises a discretion not inconsistent with sound judgment and good seamanship. ***THE H. F. DIMOCK***, 77 F. 226, 229-230 (1st Cir. 1896).

O'Siochru and Kiely were piloting their boats during an informal sailboat race when the plaintiff was struck by the boom of Kiely's boat.  At the time the boom struck the plaintiff, O'Siochru believed that his boat was providing Kiely's boat sufficient space so that both boats could round the marker without colliding.  Kiely believed that the boats were coming close to each other as they approached the marker and eventually there may be a risk of collision.  He believed that there was sufficient room for his boat to safely jibe and open up the distance between the boats.  Kiely then jibed his boat. Accordingly, this Honorable Court should put itself in the position of O'Siochru and Kiely at the time of the circumstances involved and consider the rights of the parties in assessing whether O'Siochru and Kiely should be held liable for the plaintiff's alleged loss of taste and smell.

> Navigators are not to be charged with negligence, unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown.  **_THE CLARENCE L. BLAKESLEE_**, 243 F. 365, 366 (2nd Cir. 1917)

To successfully compete in a sailboat race, its Master is continuously confronted by numerous ever changing variables including but not limited to: his vessel's speed over the ground; the prevailing weather;

the speed of the currents; his vessel's positioning in relation to his competitors' vessels; his standing in the race and the physical characteristics of the maneuver contemplated.

Kiely will testify that at the time of executing his jibe his vessel was approximately five to ten meters [5-10m] or fifteen to thirty feet [15-30 ft.] before the marker. At the time he executed his jibe, he was concerned that his boat may eventually collide with O'Siochru's vessel, but he also intended to move his sails from his portside to his starboard side in order for his boat to round the marker. Therefore, he jibed. His boom swung from port to starboard and the end of the boom struck the plaintiff in the back of her neck. At no time, did Kiely know nor should he have known that his execution of a jibe at that point in the race would result in the boom striking the plaintiff.

With respect to O'Siochru's actions, his boat was making a direct line for the marker. As is common in sailboat racing, his boat and Kiely's boat came within close proximity of each other as they neared the marker, but the boats did not contact nor did O'Siochru impede Kiely's navigation. O'Siochru was not on notice that Kiely would jibe approximately five to ten meters [5-10m]

before the marker.  Accordingly, this Honorable Court should not find them liable for the plaintiff's alleged injury, but simply that each Master made an evaluated decision under the given and then prevailing circumstances.

> We recognize that a problem calling for the exercise of sound judgment confronted the Haven's master, and we are not disposed to substitute our judgment for that of the master, where we think there is a fair choice between two courses.  ***THE HAVEN***, 277 F. 957, 959 (2nd Cir, 1921)

This Honorable Court should not look to the result of O'Siochru's and Kiely's decisions and assess whether the plaintiff's allegations of negligence are justified.  This Honorable Court must place herself in the Hunter 140s on July 5, 2002 and determine whether O'Siochru's and Kiely's judgments, at that time, were reasonable under the circumstances.  The mere happening of an accident is not evidence of negligence. Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg, 862 F.2d 767, 1989 AMC 330 (9th Cir. 1988)

The defendants submit that in the circumstances presented in this case neither O'Siochru nor Kiely are legally liable for the plaintiff's alleged injury.  Under the most unfavorable viewing of their actions, they may

have made an error of judgment at that point in the sailboat race.

The Court should not only look to the evidence presented, but it must weigh the credibility of the witnesses in assessing O'Siochru's and Kiely's decision. *See **Naglieri v. Bay***, 2000 AMC 135, 1342 (D.Conn). Here, the plaintiff maintains that the boats collided and then she was struck by the sailboat boom. O'Siochru and Kiely maintain that the boats never contacted each other and only Kiely's boom struck the plaintiff. Accordingly, this Court's determination of the parties' credibility is essential in its assessment of liability.

Finally, the defendants owed the plaintiff a duty of reasonable care under the circumstances, but were not obligated to warn her of open and obvious dangers. **Marin v. Myers**, 665 F.2d 57, 58 (4th Cir 1981). The plaintiff testified at her deposition that she failed to see the swinging sailboat boom despite the fact that the boats were in close proximity to each other. According to O'Siochru, the plaintiff stated that she had sailed in the past, but had not sailed for a number of years before July 5, 2002. The plaintiff testified that she and O'Siochru sailed in their boat for some twenty to thirty minutes before the alleged incident occurred. During this period

of time, the plaintiff must have moved from side to side in the boat to effectuate turns and jibes. Despite her prior experience and the events leading up to the race, the plaintiff failed to maintain a proper lookout for her own safety during the race when the boom from Kiely's vessel swung in her vicinity. Accordingly, the defendants did not breach any duty of care because the purported danger of a swinging sailboat boom was an open and obvious condition.

IV.    <u>COMPARATIVE FAULT</u>

> Liability for damages in a maritime action is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault. ***Lovuolo v. Gunning***, 925 F.2d 22, 28 (1st Cir. 1991)

The plaintiff is comparatively at fault for her injuries. The plaintiff willingly participated in a sailboat race on the evening of July 5, 2002. The totality of the circumstances, beyond the plaintiff's own statements, presents the fact that NCS was conducting a sailboat racing event at Jetty's Beach. Therefore, it follows that the plaintiff knew or should have known by her boat's actions that she was participating in sailboat race.

Further, the plaintiff failed to avoid an open and obvious danger in sailboat racing – a swinging sailboat boom.  A danger she should have recognized as a potential hazard given her age, previous sailing experience, and her sailing activity with O'Siochru before the race began. Accordingly, the defendants submit that the plaintiff contributed to her injuries by participating in the race and failing to keep a proper lookout for herself.

VI.   <u>LIMITATION OF LIABILITY</u>

NCS contends that its liability is limited to the value of its boats at the time of the incident pursuant to the Limitation of Shipowners' Liability Act ("Limitation Act"), **46 U.S.C.A. §30510 et seq**.[1]  The Limitation Act allows an owner to limit its liability to the value of its interest in the boat, if the owner can establish that it lacked privity or knowledge of the act or condition that caused the injury.  The Limitation Act does not define the phrase "privity or knowledge," but its central meaning has been clarified by the U.S. Supreme Court.  Privity and knowledge requires some degree of personal participation

---

[1] The Limitation Act was formerly 46 U.S.C.A. §183 et seq.

by the owner in the fault or negligence causing the injury.[2]

Where the boat is owned by a corporation, the test is whether the culpable participation or neglect of duty can be attributed to a corporation's "executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell v. Phipps*, 317 U.S. 406, 410-11 (1943) (*"A corporation necessarily acts through human beings. The privity of some of those persons must be the Privity of the corporation else it could always limit its liability. Hence the search in those cases is to see where in the managerial hierarchy the fault lay"*) accord *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 4 (1st Cir. 1999).

The Limitation Act "affords protection to the physically remote owner who, after the ship breaks ground, has no effective control over his water-borne servants." *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977). As such, the privity or knowledge of the boat's crewmembers is not attributed to the boat owner for limitation purposes. *Id.; Complaint of G.b.R.M.S. CALDAS*, 350

---

[2] *Coryell v. Phipps,* 317 U.S. 406, 410-11 (1943); *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999).

F.Supp. 566, 573 (E.D.Pa. 1972)(*"A shipowner is entitled to exoneration or limitation unless there is personal privity or knowledge of the shipowner or, in the case of a corporate owner, of the managing officers or agents. The negligence of the master, chief engineer, ship's officers or seamen does not deprive an owner of the statute's protection"*).

Accordingly, in the typical situation involving a corporate owner, the determination focuses on whether the boat's shore-based management possessed privity or knowledge of the act or condition that caused the injury. *Id.; accord **Carr v. PMS Fishing Corp.**, 191 F.3d 1, 4 (1st Cir. 1999).*

In determining whether a corporate employee is management whose knowledge precludes limitation, the following factors may be considered:

    (1)   The scope of the employee's authority over day-to-day activity in the relevant field of operations;

    (2)   The relative significance of this field of operations to the business of the corporation;

    (3)   The employee's ability to hire or fire other employees;

    (4)   The employee's power to negotiate and enter into contracts on behalf of the company;

    (5)   The employee's authority to set prices;

    (6)   The employee's authority over the payment of expenses;

    (7)   Whether the employee's salary is fixed or contingent, and;

    (8)   The duration of the employee's authority, i.e., full-time of restricted to a specific shift.

*In Re Hellenic Inc.,* 252 F.3d 391 (5th Cir. 2001).

This Honorable Court will determine whether NCS is entitled to limit its liability.  In making its determination, the Court must first determine whether NCS's negligence or unseaworthiness caused the accident.  Second, the Court must determine whether NCS's management was privy to, or had knowledge of, "the particular act of negligence or condition of unseaworthiness. *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 4-6 (1st Cir. 1999).  To the extent the plaintiff establishes negligence and/or unseaworthiness, it will be the NCS's burden to establish lack of privity or knowledge.  *Id*.

NCS will offer evidence that the two Hunter 140s involved in the alleged incident had a fair market value of $4,320.00 each.  Accordingly, pursuant to the Limitation Act, NCS' liability for the plaintiff's alleged loss of smell and taste should not exceed $8,640.00.

                  Respectfully submitted
                  by their counsel;
                  **CLINTON & MUZYKA, P.C**

<u>"/s/Thomas J. Muzyka"</u>
**Thomas J. Muzyka**
**BBO NO: 365540**
**Terence G. Kenneally**
**BBO NO: 642124**
One Washington Mall
Suite 1400
Boston, MA  02108
(617) 723-9165

Dated:  November 13, 2007