UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.: 05-10088 MBB

JULIANNE MARIE EVANS,              *
                                   *
                    Plaintiff,     *
                                   *
                                   *
vs.                                *
                                   *
                                   *
RONAN O'SIOCHRU and                *
DONNCHA KIELY,                     *
                                   *
                    Defendants.    *


**PLAINTIFF'S REQUESTS FOR FINDINGS
OF FACT AND CONCLUSIONS OF LAW**


A.    **REQUESTED FINDINGS OF FACT**


1.    Julianne Evans ("Evans") was thirty nine years old on 7/5/02.

2.    Prior to her accident of 7/5/02 Evans was a licensed realtor who enjoyed, cooking, eating out at restaurants, birding, and gardening.

3.    Evans had limited experience in sailing as of 7/5/02.  Evans' experiences included sailing sunfish boats. The last time Evans sailed prior to her injury was approximately 15-20 years.

4.    The defendants had limited experience as sailing instructors as of 7/5/02.  Each defendant had participated as an assistant sailing instructor in Ireland prior to 7/5/02.

5.    The defendants were both nineteen years old in July 2002.

6.    The defendants received no instructions or education from Nantucket Community Sailing ("NCS") prior to engaging in their sailing instruction at NCS.

7.      The defendants were employed by NCS as sailing instructors. Their duties
        included providing sailing instruction to customers and members of NCS,
        including children and adults.  NCS advertised a Friday night sailing event in July
        2002.  NCS provided the sailboats, safety personnel, crash boats, starters,
        barbecue grills and sailing instructors for the event.

8.      Prior to 7/5/02 the defendants had limited experience in handling the boats used in
        the Friday night event.

9.      NCS used the Friday sailing event to encourage interest and participation in
        sailing and to generate business for NCS.

10.     NCS advertised the Friday night event, placing two advertisements in the local
        Nantucket newspaper, which provided as follows:

                **Sailing**:  Nantucket Community Sailing will offer Friday
                night races in Lasers and Hunter 140s for people of all ages
                who know how to sail and are interested in being involved
                with racing.  Races are open to the public, but are bring
                your own boat, though NCS does have a few Lasers
                available for its members.  The race series will begin this
                Friday evening and continue through Labor Day.  Activities
                will begin at 5:30 p.m.  NCS is now accepting registration
                for their Adult Instructional Sailing and Open Sailing
                programs.  For information, or to register, call (508) 228-
                6600, or check www.nantucketcommunitysailing.org.

        A second advertisement of the activities indicated that the race would begin after
        8:00 p.m. and that NCS would provide grills for barbeque as follows:

                **FRIDAY NIGHT LASER SERIES:**  Sunset, 8 p.m. at
                Jetties Beach, Nantucket Community Sailing's begins the
                Friday Night Laser Series (weather pemitting).  The
                laser sailboat races are open to the public.  BYO Boat; a
                few lasers will be available to be shared by members of
                NCS.  There will also be sailing/racing 420's and Hunter
                140's.  Bring food supplies to barbeque (NCS will provide
                a grill).  Every Friday through August 16th.  Call NCS at
                (508) 228-6600 for sign up and for information.

11.     In response to the advertisement indicating that the race would begin after 8:00,
        Evans called NCS inquiring about sailing lessons.  She was informed by NCS that
        she could go to the beach on Friday and participate in the events scheduled by
        NCS.  She was told that she could become a member and the membership would
        cost approximately $300.00 for the season.

12.     As a result of the conversation between Evans and NCS, she went to the Jetti's beach and spoke to Darragh Connolly, ("Connolly") who was a representative of NCS and the defendants' supervisor.  Connolly was the individual who supervised the defendants' work at NCS and to whom they reported.

13.     Evans asked Connolly about sailing lessons and was directed by Connolly to one of NCS sailing instructors, Ronan O'Siochru, ("O'Siochru").  Connolly asked Evans about her sailing experience and she informed him that she had limited experience and had not sailed for several years.

14.     Connolly asked his instructor O'Siochru to take Evans out on an NCS boat.  Connolly decided to reassign O'Siochru's crew member to another boat and put Evans in O'Siochru's boat.

15.     Unbeknownst to Evans, a race course had been set up by NCS consisting of existing buoys and a starter (committee) boat owned and operated by NCS.  There were no other markers or objects placed on or in the water designating the area as a race course.

16.     O'Siochru placed Evans in his boat which was owned by NCS.  After about 10-20 minutes O'Siochru noticed Evans had little experience or knowledge about sailing, she had reduced mobility and her sail setting was poor.  He also had to tell her exactly what to do.  He also noticed she lacked mobility in the boat.  Evans told O'Siochru that she had a foot condition that limited her ability to move around in the boat.  She could not move from side to side with mobility as the boat tacked.

17.     Despite Evans' limited sailing experience and her limited mobility, O'Siochru decided to enter his boat in a race sponsored and managed by NCS.  As he began to race, O'Siochru's high school friend Donncha Kiely ("Kiely") brought his boat in close proximity to O'Siochru's boat.  Kiely's boat was to the left of O'Siochru's boat while they sailed almost parallel and approximately 1-2 feet apart.  Both defendants were jockeying for position in an attempt to gain the advantage.  Kiely also had a crew member.

18.     Just prior to the accident Kiely yelled to O'Siochru that he had the right of way.  O'Siochru attempted to gain the advantage and when he realized that there was a potential collision he attempted to move his boat to the right.

19.     Kiely, also recognizing the potential for collision, jibed his boat, causing the boom on his boat to swerve from left to right and strike Evans in the back of her neck while she was seated in O'Siochru's boat.

20.     Just prior to jibing, Kiely was aware of Evans' position on O'Siochru's boat.  Kiely was aware that a swinging boom had the potential to cause injury to anyone

in its vicinity.  Without considering the consequences to Evans, Kiely maneuvered his boat causing the boom to swing in her direction.

21.     Kiely's action in executing the jibe caused the boom to hit Evans.

22.     The defendant O'Siochru testified that he violated and/or did not comply with applicable sailing safety regulations at the time of the accident.

23.     The defendant O'Siochru testified that he discussed the accident with defendant Kiely and they both admitted partial responsibility for causing the accident.

24.     At the time of the accident both defendants were trying to gain an advantage in the race.

25.     As a result of the boom strike, Evans fell into the boat.  She was unconscious, disoriented, and kept her eyes closed for several minutes.  Her first memory after the incident was on the beach.

26.     After the boom from Kiely's boat hit Evans, Kiely continued to race until O'Siochru yelled for help.

27.     A rescue boat provided by NCS pulled O'Siochru's boat to shore.

28.     Evans was taken to the hospital. The hospital records show the first call for the EMT was recorded at 6:37 P.M.  Evans arrived at the hospital at 7:07 P.M.  The EMT and hospital records indicate Evans was hit with a boom was unconscious, and complaining of a headache. She was given percocet for pain.

29.     She was examined, treated, and released.

30.     Evans complained of head, back, and neck pain at the hospital.

31.     Evans remained partially bedridden for approximately 10 days.

32.     On the tenth day she noticed she did not smell her dog's feces.

33.     Evans fell and injured her ankle on August 8, 2002.  She also injured her wrist on August 28, 2002.  She was treated at the hospital for these injuries.

34.     Between July 25-29, 2002, Julia Anderson came to visit Evans.  During her visit she noticed Evans acting oddly during meals by putting excessive amounts of salt on her food and reportedly complaining that the food had no taste.  She also complained of back and neck pain.

35.    Due to a lack of medical personnel and their availability, Evans was unable to get a medical appointment with a specialist until September 2002.  The appointment was made by the hospital where she was treated.

36.    Evans saw Dr. Michael Ackland's physician assistant on September 18, 2002. Her complaints were mostly related to her back, neck, ankle, and wrists.

37.    Evans saw Dr. Ackland on October 15, 2002.

38.    Evans testified she told one of these medical providers of her loss of taste and smell.

39.    The medical records of Dr. Ackland and the PA do not contain any reference to complaints of loss of smell and taste.  Dr. Ackland testified that even if Evans made these complaints it may not have been recorded since his office would not be treating these injuries.

40.    Evans returned to her home in Florida in November 2002.

41.    Evans began physical therapy under Dr. Ackland's orders.

42.    Evans retained counsel to represent her.

43.    On April 9, 2003 Evans was examined by Dr. Rosomoff a board certified neurologist.  Evans was unable to get an earlier appointment due to the doctor's busy schedule.  Dr. Rosomoff was the medical director at the University of Miami Comprehensive Pain and Rehabilitation center.

44.    Dr. Rosomoff confirmed that Evans had a closed head injury with cerebral contusion and loss of smell which is likely permanent.

45.    Evans was requested by NCS's marine accident investigator to undergo an IME by Dr. Paul Flaten, a board certified neurologist in Florida.

46.    Evans was seen and examined by Dr. Flaten on June 12, 2003.  Dr. Flaten's opinion was that Ms. Evans sustained a loss of smell and taste as a result of her boating accident and that her condition was probably permanent.  Specifically, he found that she only had symptoms of loss of taste and smell after her boating accident.  His opinion was that this would indicate shearing disruption of the olfactory filaments of the olfactory nerve.  He also opined that Evans sustained a cerebral contusion injury with disruption of the olfactory nerves and thereby shearing the nerve filament causing her the loss of smell and taste.  He also specifically agreed with the medical opinion of Dr. Rosomoff including that Evans' loss of smell was permanent.  Finally he opined that Evans' prognosis for her injury was full recovery for her orthopedic injuries but not for her loss of smell and taste.

47. Evans saw a second physician chosen by the defendant for an IME, Dr. Mann on October 25, 2004.

48. As a result of her exams by Dr. Ackland, Dr. Rosomoff, Dr. Flaten and Dr. Mann, Evans believed her condition was permanent and there was no treatment.

49. Evans was examined by another medical specialist for a third IME, Dr. Robert Henkin. Dr. Henkin examined and tested Evans and opined that Evans suffered from post-concussive syndrome, hyposmia Type II severe; hypogeusia Type I; Phantosmia, and Aliosmia. His opinion was that her hyposmia was so severe she fell into a small category of severely injured patients. He described her as one of the most severe cases he has seen. Dr. Henkin testified her loss of taste and smell was permanent without treatment. He had no opinion about treatment other than Synthroid for hypothyroidism.

50. Evans was seen by Dr. Alan Hirsch. Dr. Hirsch obtained an extensive history, and performed several tests and examinations on November 17,2006 on Evans, including a psychological evaluation. Dr. Hirsch is board certified in several medical specialties. Dr. Hirsch obtained a history from Evans that she was struck in the back of her neck by a boom while sailing in Nantucket on 7/5/02 and that she experienced a loss of consciousness. He found that she had no appetite for several days with few bowel movements and that she was mostly bedridden for approximately ten days. On the tenth day she noticed she could not smell her dog's feces. She also complained that food had no taste and she sent her food back at restaurants complaining about the lack of taste. He noted that she had major complaints related to neck and back pain, and severe spasms in her lower back. She suffered an injury to her ankle and wrist in August 2002 that required treatment. She began to eat more in an effort to taste and gained excessive weight, approximately 25 lbs. Her neck pain persisted for several weeks. She was seen by Dr. Rosomoff for persistent neck pain and loss of smell and taste. She was using excessive amounts of salt in her food. She experienced a fire in her stove while cooking and was not aware that it had occurred until the fire was over. She was unable to smell any smoke. She had distorted smell sensations and some smells of rotting flesh. She had been under physical therapy on and off for approximately two years in a cast on her foot and was diagnosed with a peroneal tendon rupture. She underwent surgery on her right foot in November 2004. Evans was on bed rest for two months. After her foot surgery she fell and fractured her left arm. Her neck pain persisted. By 5/2/05 she had gained 30 lbs. In July 2006 she saw Dr.Henkin for her third IME. Dr. Henkin diagnosed her with Type I hypogeusia, and Type II (severe) hyposmia. Coincidentally, thyroid function blood tests showed hypothyroidism.

51. Evans had been tested for hypothyroid in September 2005 by her primary care physician and her blood tests results were all normal. Dr. Hirsch opined that there was no medical evidence to suggest Evans was hypothyroid before the date of her

accident, July 2002.  Evans began using, Synthroid in 2006 and noticed a temporary slight increase in smell.  This increase is no longer experienced by Evans.  Dr. Hirsch testified that head injury patients can experience a loss of smell and taste over time; in some cases several months after the original accident.  He testified that her smell problems interfered with her eating and with everyday functioning.  She no longer enjoyed entertaining, cooking, drinking wine, or going out to eat.  She is fearful of being involved in a fire.  Her problems also affect her psychological well-being; she is frequently crying.  He found her to suffer from cacosmia, hyposmia, ageusia, and phantosmia.

52.    Evans testified that she has continued to experience a loss of taste and smell.  Except for a brief period her loss of smell has remained permanent.  Although she has some ability to smell, the smells are distorted.

53.    Evans is not able to taste anything and Dr. Hirsch has opined her loss of taste is permanent.

54.    Evans' loss of taste and smell has greatly interfered with her ability to enjoy life.  She does not enjoy eating, dining at restaurants, or social events revolving around meals.

55.    Evans' twin sister, Jan Chamberlain, testified that Evans' personality has changed from a vibrant happy-go-lucky person to one consumed with complaints about her loss of these senses.  Both Jan Chamberlain and Julia Anderson describe Evans as a person deeply and adversely affected by her injury.  They describe constant annoying complaints and comments by Evans about flowers and food, that have made their visits together problematic and unenjoyable.

56.    Evans often cries over her inability to smell and taste.  She misses the ability to smell grass, flowers, babies, and men.  She is a woman deeply harmed by her losses.

57.    The only credible medical testimony about causation indicates the proximate cause of her losses to be as a result of her boating accident and head injury.  These conditions are permanent and she will likely suffer from loss of taste and smell for the rest of her life.

58.    Dr. Hirsch testified there is no known medical cure for these injuries.  The physicians that have examined Evans related to her loss of smell and taste have opined her condition is permanent.

59.    The defendants' lack of experience and age were contributing factors to the incident.  O'Siochru was aware of Evans' limited sailing ability and mobility which should have alerted O'Siochru not to participate in a race with Evans on board.

60.     I find that the negligence of Kiely in jibing his boat without adequately considering the danger which his boom posed to Evans was a substantial contributing cause of Evans' injuries.

61.     I find that the negligence of O'Siochru in encroaching on Kiely's right of way and failing to yield to Kiely's boat in timely fashion was a substantial contributing cause of Evans' injuries.

62.     I find that as a result of the combined negligence of O'Siochru and Kiely, Evans was hit by the boom of Kiely's sailboat, causing her injuries.

63.     I find that at the time of the incident, Kiely and O'Siochru were acting within the scope of their employment.

64.     I find that at the time of the incident, Kiely and O'Siochru were performing duties related to the conduct of NCS' business.

65.     I find no evidence that any conduct of Evans was a substantial contributing cause of her injuries.

66.     I find that as a result of defendants' negligence, Evans sustained a complete loss of the sense of taste.

67.     I find that as a result of defendants' negligence, Evans sustained a virtually complete loss of the sense of smell.

68.     I find that Evans' loss of taste is permanent.

69.     I find that Evans' loss of smell is permanent.

70.     I find that as a result of the incident and the resulting injuries, Evans has incurred substantial pain and suffering, loss of enjoyment of life and severe emotional distress.

71.     I find that a reasonable amount of damages to compensate Evans for her past, present and future injuries is $2.5 Million.


**B.     REQUESTED CONCLUSIONS OF LAW**


1.     Where a vessel has neglected the usual and proper measures of precaution, the burden rests on that vessel to show that the incident was not due to her negligence.  The Great Republic, 90 U.S. 20 (1874); The H.F. Dimock, 77 F. 226 (1st Cir. 1896).

2.    Violation of a rule of navigation is evidence of negligence and creates a presumption of liability against the vessel in violation of the rule. See The Pennsylvania, 86 U.S. 125 (1873).

3.    Violation of the rules of sailing is evidence of negligence. Crowley Marine Services, Inc. v. Maritrans, Inc., 447 F.3d 719 (9th Cir. 2006).

4.    A boat passenger is comparatively negligence only where she fails to exercise reasonable care for her own safety. Dodgen v. Timmons, 935 F.2d 1286 (Table)(4th Cir. 1991).

5.    The conduct of an employee is within the scope of his employment if it is the kind of conduct he is expected to perform, if it occurs substantially within authorized time and space limits and if it is motivated, at least in part, by a purpose to serve the employer. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854 (1986).

6.    The phrase in an insurance contract "related to the conduct" of the insured's business means any acts arising out of the conduct of the business or incidental to the business. Transcontinental Ins. Co., v. Edwards, 1996 WL 814532 (W.D. Ark. 1996).

## C.    SUPPORTING LEGAL ANALYSIS

### Negligence

The defendants claim that their actions constitute excusable "errors in judgment" and are not negligent. Nothing could be further from the truth.

The defendants cite language in cases such as The H.F. Dimock, 77 F. 226 (1st Cir. 1896) and The Clarence L. Blakeslee, 243 F. 365 (2nd Cir. 1917), which bears no relation whatsoever to this case. The H.F. Dimock, for example, related to a collision between two ships in a dense fog. The court indicated that "when everything about the case indicates a reasonable degree of vigilance", the master of a ship should not be held liable, 77 F. at 231. However, because the Dimock had violated a statute and had failed to drop anchor in the deep fog, she was found at fault for the collision. Similarly, in The

Clarence L. Blakeslee, involving a collision on windy and rough seas, when one ship came to the aid of another, the court indicated that although some errors in judgment may not constitute negligence, where a navigator in charge of a ship makes a decision "which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown", the navigator has acted negligently.

The instant case involves an injury incurred during the course of a recreational sailboat race, not a collision on the high seas in difficult conditions. The testimony established that the two teenagers operating the sailboats were using overly aggressive tactics of operation in an attempt to win the race. O'Siochru encroached on Kiely's right of way, resulting in Kiely executing his jibe, which injured Evans. Neither O'Siochru nor Kiely acted with appropriate concern for Evans' safety; to the contrary, they violated rules of sailing in an attempt to win the race, placing Evans in a position of unreasonable danger. Their actions easily crossed over the line of "errors of judgment" and obviously entered into the realm of negligence.

In this case, the evidence showed that O'Siochru violated the "starboard side rule". Under that rule, when two vessels are on a crossing course so as to involve a risk of collision, the vessel which has the other vessel on her starboard side must give way to the other vessel, as required by the rules of navigation. Tidewater Associated Oil Co. v. United States, 60 F. Supp. 376 (S.D. Cal. 1945). O'Siochru violated this rule of navigation, resulting in Kiely's jibe, which caused Evans' injury. As Kiely admitted at trial, he was aware of Evans' position, was aware that a swinging bow could cause injury, and nevertheless swung the boom in her direction. There is no question that the defendants were negligent.

**Comparative Negligence**

The doctrine of comparative negligence applies in Admiralty cases.  In the instant case, however, there was absolutely no evidence that any negligence on the part of Evans contributed to her injury.  Accordingly, the court must conclude that Evans was not at fault.

**Insurance Coverage**

As plaintiff indicated in her Pretrial Memorandum, she sought a stipulation from defense counsel that the applicable insurance policy provided coverage for the negligence of the individual defendants.  The defense refused to so stipulate, so plaintiff is seeking a request for a finding of fact which will establish that the defendants were covered under the policy.

Under the insurance policy produced by the defendants in response to a request by plaintiff,[1] NCS employees are covered "for acts within the scope of their employment by the Named insured or while performing duties related to the conduct of the Named Insured's business".

The trial court may make findings of fact on issues that are helpful to the parties. See Centricut, LLC v. Esab Group, Inc., 2003 WL 21558348 (D. N.H.), rev'd on other grounds, 390 F.3d 1361 (Fed. Cir. (N.H.) 2004).  Although the applicability of the insurance coverage is obvious, since the defendants refused to stipulate as to the

---

[1] It appears that the policy period in the policy produced by defendants is 2004-05.  Plaintiff assumes that the same coverage applied in the 2002 policy.

applicability of the policy, the plaintiff has sought findings of fact relating to the

applicability of the policy in order to prevent any possible future issue in that regard.

The policy is applicable if the defendants were either acting in "the scope of their

employment" or "while performing duties related to the conduct of [NCS'] business".

The facts adduced at trial satisfy both of these standards.  The conduct of an employee is

within the scope of his employment if it is the kind of conduct he is expected to perform,

if it occurs substantially within authorized time and space limits and if it is motivated, at

least in part, by a purpose to serve the employer.  Wang Laboratories, Inc. v. Business

Incentives, Inc., 398 Mass. 854 (1986).  Each of these factors is satisfied in the instant

case.  Even assuming arguendo that the court were somehow to conclude that defendants

were not acting in the scope of their employment, it cannot be denied that they were

"performing duties related to the conduct" of NCS' business.  As indicated by NCS' own

newspaper advertisement, the Friday night race invitation was coupled with a solicitation

to register for NCS' sailing programs.  It was admitted at trial that NCS used the Friday

night racing program to encourage interest and participation in sailing on Nantucket and

to generate business.  Evans called NCS for information and was directed to the event by

NCS personnel, who also invited her to buy a membership in NCS.  It is beyond

peradventure that O'Siochru and Kiely were performing duties "related to the conduct" of

NCS' business in connection with the Friday night event.

## D.    CONCLUSION

The plaintiff respectfully requests that the court find the facts as requested herein.

Specifically, the plaintiff requests that the court find that:

1.    The defendants were negligent and that their negligence was the proximate cause
      of Evans' injuries;

2.    Evans was not comparatively negligent;

3.    The fair and reasonable value of Evans' injuries is $2.5 Million;

4.    The defendants were acting within the scope of their employment and were
      performing duties related to the conduct of NCS' business at the time of the
      incident.

      WHEREFORE, the plaintiff requests that the court enter judgment for the plaintiff

in the amount of $2.5 Million plus interest and costs.


                                      Respectfully submitted,
                                      The Plaintiff,
                                      By Her Attorneys,

                                      /s/ David P. Angueira
                                      _____
                                      Edward M. Swartz
                                      BBO No. 489540
                                      David P. Angueira
                                      BBO No. 019610
                                      Alan L. Cantor
                                      BBO No. 072360
                                      Swartz & Swartz
                                      10 Marshall Street
                                      Boston, MA 02108
                                      (617) 742-1900

## <u>CERTIFICATE OF SERVICE</u>

I, David P. Angueira, Esq. do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

Electronically Serviced Through ECF:

    Terrence Kenneally, Esq.
    Clinton & Muzyka
    1 Washington Mall
    Boston, MA 02108

This 30th day of November, 2007.

                              /s/ David P. Angueira

                              _____

                              David P. Angueira