UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05-10088-MBB

JULIANNE MARIE EVANS
     Plaintiff,

vs.

RONAN O'SIOCHRU and DONNCHA KIELY
     Defendants.

DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

Now come the defendants, Ronan O'Siochru and Donncha Kiely, by and through their undersigned counsel, Clinton & Muzyka, P.C., and respectfully submit their Proposed Findings of Fact and Conclusions of Law, pursuant to this Honorable Court's Order of December 11, 2007 and its extension.

PROPOSED FINDINGS OF FACT

1.   The plaintiff was born October 23, 1962. *Trial Tr. Day One, pg. 43 ln.7-8.*

2.   Prior to July 2002, the plaintiff had traveled to Nantucket every summer since 1997. *Trial Tr. Day One, pg.55 ln.8-13 & Trial Tr. Day Three, pg.11 ln.4-5.*

3.    When the plaintiff was about fifteen [15] years of age, she was diagnosed with Charcot-Marie-Tooth Disease, which is a nerve condition effecting her circulation and sensation in her feet. *Trial Tr. Day One, pg.57-58 ln.23-5 & pg.59 ln.1-2.*

4.    When the plaintiff was a young girl, her father was the president of a sailing club.  Her family lived on a lake in Michigan, and she sailed all day long. *Trial Tr. Day One, pg.59-60 ln.17-1 & pg.136-138 ln.18-6.*

5.    On July 5, 2002, the plaintiff read an article in a local Nantucket newspaper concerning a sailing and barbeque event at Jetty's Beach.  The article listed a telephone number for Nantucket Community Sailing, Inc. and the plaintiff called the telephone number to inquire about joining the club and obtaining sailing lessons. *Trial Tr. Day One, pg.60-61 ln.18-8 & Trial Tr. Day Three, pg.12 ln.1-3.*

6.    On July 3, 2002, *The Inquirer and Mirror*, a local newspaper in Nantucket, ran the following article in its sports section on page 1B.

**Sailing**: Nantucket Community Sailing will offer Friday night races in Lasers and Hunter 140s for people of all ages who know how to sail and are interested in being involved with racing. Races are open to the public, but are bring your own boat,

though NCS does have a few Lasers available for its members. The race series will begin this Friday evening and continue through Labor Day. Activities will begin at 5:30 p.m. NCS is now accepting registration for their Adult Instructional Sailing and Open Sailing programs.  For information, or to register, call (508) 228-6600, or check www.nantucketcommunitysailing.org.

*See Defendants' Exhibit A, marked and admitted on 11/15/2007.*

7.    On July 3, 2002, *Island Calendar*, a local newspaper

in Nantucket, listed the following article in its

activities section for Friday, July 5, 2002.

**FRIDAY NIGHT LASER SERIES:** Sunset, 8 p.m. at Jetties Beach, Nantucket Community Sailing's begins the Friday Night Laser Series (weather permitting). The laser sailboat races are open to the public. BYO Boat; a few lasers will be available to be shared by members of NCS. There will also be sailing/racing 420's and Hunter 140's. Bring food supplies to barbeque (NCS will provide a grill). Every Friday through August 16th. Call NCS at (508) 228-6600 for sign up and for information.

*See Plaintiff's Exhibit 1, marked and admitted on 11/15/2007.*

8.    As a result of her telephone conversation with

Nantucket Community Sailing, Inc. on July 5, 2002,

the plaintiff traveled to Jetties Beach and arrived

there at 5:00 p.m. *Trial Tr. Day One, pg.61 ln.19-*

*21.*

9.    Upon her arrival at Jetties Beach, the plaintiff met

and spoke with Darragh Connolly (hereinafter

"Connolly") who she understood was the "guy in charge

of the sailing club." *Trial Tr. Day One, pg.61-62 ln.19-2 & pg.62 ln.11-13.*

10. Connolly introduced the plaintiff to the co-defendant, Ronan O'Siochru (hereinafter "O'Siochru"), and indicated that the plaintiff was interested in participating in the sailing race. *Trial Tr. Day One, pg.65 ln.18-23 & Trial Tr. Day Three, pg.159-160 ln.24-4.*

11. Prior to traveling to Nantucket and working for Nantucket Community Sailing, Inc. in 2002, O'Siochru and Donncha Kiely (hereinafter "Kiely") possessed considerable sailing experience, including several years of formal instruction and training, owning sailboats, and racing competitively. *Trial Tr. Day Three, pg.132-133 ln.15-20, & pg.137 ln.21-23 & Trial Tr. Day Four, pg. 136-137 ln.19-19.*

12. During his employment with Nantucket Community Sailing, Inc., O'Siochru was never involved in sailing lessons after 5:30 or 6:00 in the evening. *Trial Tr. Day Three, pg. 146-147 ln.23-3 & Trial Tr. Day Four, pg.79 ln.18-22.*

13. Prior to July 5, 2002, O'Siochru and Kiely understood that on Friday evenings in July 2002, Nantucket Community Sailing, Inc. intended to sponsor informal

sailboat racing with a barbeque to follow as a "community based initiative" that would attract local people to participate in sailboat racing. *Trial Tr. Day Three, pg.148 ln.4-21, pg.150 ln.7-13, pg.153 ln.14-16, & Trial Tr. Day Four, pg.139 ln.8-14, pg.141 ln.12-18, & pg.147 ln.8-14.*

14. Prior to sailing with the plaintiff, O'Siochru understood that the plaintiff had sailing experience, knew how to sail, and she was to be his "crew for the races." *Trial Tr. Day Three, pg.161-162 ln.20-11 & Trial Tr. Day Four, pg.13 ln.13-25, pg.80 ln.1-13, & pg.81 ln.7-10.*

15. Prior to participating in the Friday Night Races, Kiely understood that "the people who came….knew how to sail… [based upon] representations they would have made to … anyone else that was present." *Trial Tr. Day Four, pg.142 ln.2-12.*

16. Prior to the onset of the race, there was no meeting between its participants to discuss navigational/sailing rules. *Trial Tr. Day Four, pg.82 ln.2-5.*

17. After speaking with Connolly and O'Siochru, the plaintiff "put on a life preserver", boarded a Hunter 140 sailboat with O'Siochru, and "sailed off" with

O'Siochru. *Trial Tr. Day One, pg.66 ln.14-17 & Trial Tr. Day Four, pg.15 ln.3-17..*

18. Nantucket Community Sailing did not use its six [6] Hunter 140 sailboats for sailing lessons because it was difficult for the "helmsman to change over with the crew." *Trial Tr. Day Four, pg.17 ln.4-13, pg.18 ln.4-14, & pg.148 ln.8-10.*

19. The plaintiff and O'Siochru sailed together for some twenty to thirty [20-30] minutes before the incident occurred. *Trial Tr. Day One, pg.67 ln.5-7 & Trial Tr. Day Three, pg.19 ln.14-16.*

20. Prior to the incident occurring, O'Siochru instructed the plaintiff on tending the jib sheet and keeping her head down when the boat was tacking and jibing. *Trial Tr. Day Three, pg.19-20 ln.23-2 & Trial Tr. Day Four, pg.19 ln.21-24 & pg.21 ln.10-15.*

21. Prior to the incident occurring, the plaintiff and O'Siochru entered their vessel in a race with five [5] other Hunter 140's. *Trial Tr. Day Four, pg.35 ln.1-8 & pg.87 ln.12-14. See also Defendants' Exhibit A, marked and admitted on 11/15/2007 & Plaintiff's Exhibit 1, marked and admitted on 11/15/2007.*

22. During the twenty to thirty [20-30] minutes before the incident, the plaintiff never asked to return to

the beach; she never complained about tending the jib sheet; and she seemed as if she was enjoying herself. *Trial Tr. Day Four, pg.87 ln.1-14 & pg.91 ln.12-20.*

23. While plaintiff and O'Siochru sailed together, the plaintiff was not "really paying attention…." *Trial Tr. Day One, pg.68 ln.8-11 & Trial Tr. Day Three, pg.29 ln.21-24 & pg.30 ln.19-20.*

24. The sailboat race began at an imaginary starting line extending from a buoy to a committee boat. *Trial Tr. Day Four, pg.36-37 ln.24-1.*

25. At the starting line, the boats were within two to three [2-3] feet of each other. *Trial Tr. Day Four, pg.88-89 ln.23-11.*

26. The purpose of the race was to win safely. *Trial Tr. Day Four, pg.38 ln.16-17 & pg.77 ln.9-13.*

27. During the race, O'Siochru understood that the "racing rules follow[ed] the same as maritime rules to avoid collisions at sea." *Trial Tr. Day Four, pg.48 ln.10-15.*

28. During the race, O'Siochru, tending the tiller, possessed full control to stop the boat. *Trial Tr. Day Four, pg.38 ln.18-22.*

29. During the moments before the incident, the plaintiff sat on the boat's port side gunwale "about one-third

in from" the bow and tended the jib sheet while
O'Siochru tended the boat's tiller and main sheet at
its stern. *Trial Tr. Day One, pg.68-69 ln.24-12,
Trial Tr. Day Three, pg.27-288 ln.24-8, & Trial Tr.
Day Four, pg.22 ln.15-23 & pg.52 ln.21-25.*

30.    After completing one leg of the race, O'Siochru's
boat approached another course marker buoy. *Trial Tr.
Day Four, pg. 45-46 ln.21-2.*

31.    As O'Siochru's boat approached the course marker buoy
with the plaintiff sitting on the boat's port side, a
second boat piloted by Kiely approached O'Siochru's
boat along its port side. *Trial Tr. Day One, pg.69
ln.22-24.*

32.    As Kiely's boat approached O'Siochru's boat,
O'Siochru "did not believe that the boats were going
to collide." *Trial Tr. Day Four, pg.49 ln.13-17.*

33.    As Kiely's boat approached O'Siochru's boat,
O'Siochru understood that "[i]f you're the stand-on
vessel, it's your obligation to hold course until
such time as you believe that a collision will occur
unless an alteration of course by both vessels. If
you are the give-way vessel, you are an under
obligation to avoid a collision with the vessel that

you may be on a collision course with." *Trial Tr. Day Four, pg.50 ln.15-24.*

34.   As Kiely's boat approached O'Siochru's boat, Kiely yelled to O'Siochru indicating that Kiely's boat had the "right-of-way." *Trial Tr. Day Four, pg.66 ln.8-10 & pg.152 ln.15-24.*

35.   When O'Siochru and Kiely spoke prior to the incident occurring, their boats were some five to ten [5-10] meters from the course marker buoy. *Trial Tr. Day Four, pg.103 ln.2-4.*

36.   As Kiely's boat and O'Siochru's boat approached the course marker buoy, their estimated speed over the ground was three and one half to five [3.5-5] knots. *Trial Tr. Day Four, pg.99 ln.21-25, pg.134-135 ln.20-1 & pg.167 ln.8-12.*

37.   After speaking with Kiely and prior to the incident occurring, O'Siochru understood that his boat was the "give-way vessel." *Trial Tr. Day Four, pg.51 ln.4-10 & pg.102-103 ln.24-1.*

38.   As the "give-way vessel", O'Siochru understood that his boat must yield the right-of-way to Kiely's boat and provide Kiely's boat enough distance to round the course marker buoy and avoid a collision. *Trial Tr.*

*Day Four, pg.51 ln.4-20, pg.61-62 ln.24-4 & pg.104 ln.12-20.*

39. During the race, the closest distance between Kiely's boat and O'Siochru's boat was one and one-half feet to two [1.5-2] feet. *Trial Tr. Day Four, pg.41 ln.13-17.*

40. During the moments before the incident, neither O'Siochru's boat nor Kiely's boat were operated with the assistance of any instrumentation whatsoever to measure their boats' speeds or the direction of the wind. *Trial Tr. Day Four, pg.103 ln. 11-15, pg.104-105 ln.24-16 & pg.164 ln.13-21.*

41. During the moments before the incident, O'Siochru "pulled the tiller slightly towards [himself] and off enough to ensure that the boats were not going to collide." This repeated maneuver maintained the distance between the two boats by some two to three [2-3] feet. *Trial Tr. Day Four, pg.55 ln.3-24, pg.57 ln.11-19 & pg.154 ln.7-9.*

42. The movement of the tiller is influenced by the direction of the prevailing winds. *Trial Tr. Day Four pg.56 ln.19-21.*

43. As O'Siochru maintained the distance between the two boats, Kiely believed that "there may potentially be

a collision at some stage and therefore …" he jibed to avoid a collision "further down the course." *Trial Tr. Day Four, pg.154 ln.14-22.*

44. As Kiely's boat jibed, he estimated the distance between the boats at two [2] feet, their relative speeds and taking into account that as his boat turned to port, its boom would clear the plaintiff. *Trial Tr. Day Four, pg.156 ln.4-8, pg.158-159 ln.17-10 & pg.165-166 ln.4-19.*

45. As Kiely's boat approached O'Siochru's boat, the plaintiff looked down over her left shoulder, thinking that the boats contacted as they turned when she was "hit flat across the back of the neck" by the boom of Kiely's boat. *Trial Tr. Day One, pg.70 ln.5-16, Trial Tr. Day Three, pg.31 ln.11-19, & Trial Tr. Day Four, pg.61 ln.2-6 & pg.159 ln.19-23.*

46. The hulls of the two boats never collided. *Trial Tr. Day Four, pg.66 ln.5-7 & pg.105 ln.23-25.*

47. At the time Kiely's boat jibed, O'Siochru did not know "whether Mr. Kiely jibed to avoid a collision … or whether he was going to jibe … to round the mark" or any other reason for jibing. *Trial Tr. Day Four, pg.69 ln.15-20 & pg.108 ln.18-24.*

48. At no time prior to the incident did O'Siochru believe that the plaintiff was in any danger of sustaining an injury. *Trial Tr. Day Four, pg.106 ln.13-23.*

49. After being struck by the boom, the plaintiff fell forward into the cockpit of O'Siochru's boat. *Trial Tr. Day One, pg.70 ln.23-25 & Trial Tr. Day Three, pg.33 ln.9-11.*

50. While she was lying in the boat's cockpit, the plaintiff spoke to O'Siochru in a whispering tone. *Trial Tr. Day Four, pg.124-125 ln.21-4.*

51. Connolly piloted a motorboat to the location of O'Siochru's boat, secured a line to it, and towed the boat to the beach while O'Siochru tended to the plaintiff. *Trial Tr. Day Four, pg.71 ln.1-25.*

52. At 6:41 p.m., paramedics from the Nantucket Fire Department arrived at Jetty's Beach.  The paramedics noted that the plaintiff was oriented to person, place, date, and situation (A&O x 4). The paramedics provided the plaintiff with a cervical collar, secured her in a supine position to a backboard, and removed her from O'Siochru's boat.  She was placed in a vehicle, driven off the beach to an ambulance, and transported to Nantucket Cottage Hospital where she

arrived alert and oriented at 7:07 p.m. *See Plaintiff's Exhibit 3, marked and admitted on 11/16/2007.*

53. On July 5, 2002, the sun set over Nantucket Island at 8:17 p.m. *See Defendants' Exhibit F, marked and admitted on 11/16/2007*

54. At Nantucket Cottage Hospital the plaintiff complained of neck pain.  X-rays of her cervical spine and a CAT SCAN of her head were negative.  Treating physicians advised the plaintiff to rest, ice the affected area, and provided prescriptions for Motrin and Percocet for the plaintiff's pain. *See Plaintiff's Exhibit 3, marked and admitted on 11/16/2007.*

55. At trial, the plaintiff's medical expert, Alan R. Hirsch, M.D., examined the plaintiff's Nantucket Cottage Hospital medical records for her visit of July 5, 2002, and failed to discover any diagnosis that she suffered a concussion on that day. *Trial Tr. Day Two, pg.99 ln.6-11.*

56. As the plaintiff left the Nantucket Cottage Hospital on the night of July 5, 2002, she remarked to O'Siochru, "You don't need to worry about me suing,

I'm not that kind of person." *Trial Tr. Day Four, pg.116 ln.7-11 & pg.121-122 ln.18-3.*

57. On July 12, 2002, O'Siochru returned to Jetty's Beach to participate again in sailboat racing with the Hunter 140's when he observed the plaintiff sitting on the beach. O'Siochru did not approach or speak with the plaintiff. *Trial Tr. Day Four, pg.117 ln.3-19.*

58. On July 15, 2002, the plaintiff noticed that she lost her sense of smell and taste when she was unable to smell her dog's feces. *Trial Tr. Day One, pg.78-79 ln.6-5 & Trial Tr. Day Three, pg.42 ln.11-15.*

59. On or about July, 25, 2002, the plaintiff noticed that her food was bland and therefore, she heavily seasoned her food, but she did not attribute the bland food to a diminishment in her sense of taste. *Trial Tr. Day One, pg.80-81 ln.21-9.*

60. On August 8, 2002, the plaintiff fell at Brant Point Lighthouse on Nantucket. She went to the Emergency Room at Nantucket Cottage Hospital with complaints of left ankle pain. *Trial Tr. Day One, pg.83-84 ln.2-21. See also Plaintiff's Exhibit 3, marked and admitted on 11/15/2007.*

61.  On August 28, 2002, the plaintiff returned to the Emergency Room at Nantucket Cottage Hospital with complaints of right wrist pain. *Trial Tr. Day One, pg.84-85 ln.22-15. See also Plaintiff's Exhibit 3, marked and admitted on 11/15/2007.*

62.  The plaintiff never reported her loss of smell and taste to the medical staff at Nantucket Cottage Hospital during her two [2] visits in August 2002. *Trial Tr. Day One, pg.87 ln.10-15. See also Plaintiff's Exhibit 3, marked and admitted on 11/15/2007.*

63.  From July 5, 2002 until September 17, 2002, plaintiff never reported her alleged loss of smell and taste to any medical treatment provider. *Trial Tr. Day One, pg.146-148 ln.17-19.*

64.  On September 18, 2002, the plaintiff went to Ackland Sports Medicine, Inc. in Hyannis, Massachusetts seeking medical treatment.  She reported to a physician's assistant, Mark Colucci, PA-C, that she "couldn't taste or smell anything…."  A record of this visit was reviewed by Michael Ackland, M.D. The record fails to report the plaintiff's loss of smell and taste. *Trial Tr. Day One, pg.90 ln.9-14 & pg. 151*

*ln.9-11 & Trial Tr. Day Three, pg.61 ln.11-18, pg.62 ln.11-14, & pg. 66 ln.4-6.*

65.   On or about October 8, 2002, the plaintiff met with an attorney, David J. Merrigan, concerning her injuries. *Trial Tr. Day One, pg.153-154 ln.11-12.*

66.   On October 15, 2002, the plaintiff returned to Ackland Sports Medicine, Inc.  During this visit, Michael Ackland, M.D. examined the plaintiff.  The plaintiff recalled that Dr. Ackland "typed everything down" as she reported her history to him, including her loss of taste and smell.  Dr. Ackland's medical record for this visit does not include any report of the plaintiff sustaining any loss of taste or smell nor does it indicate that Dr. Ackland referred the plaintiff to see a specialist for the loss of smell and taste. *Trial Tr. Day One, pg.91-92 ln.24-19, & pg.151-152 ln.21-2 & Trial Tr. Day Three, pg.68 ln.4-9, pg.71 ln.5-11 & pg.72 ln.15-21.*

67.   Dr. Ackland doubts that he ever told the plaintiff that her loss of smell and taste was a permanent condition and further clarified that "it would be crazy for [him] to say that" to the plaintiff. *Trial Tr. Day Three, pg.68 ln.4-9, pg. 95 ln.12-15, & pg.99 ln.16-18.*

68.  In July 2006, Robert I. Henkin, M.D., Ph.D., the
     Director of the Center for Molecular Nutrition and
     Sensory Disorders - Taste and Smell Clinic, examined
     the plaintiff to evaluate the condition and
     characterization of her loss of taste and smell. The
     two-day examination occurred on July 28, 2006 and
     July 31, 2006. *Trial Tr. Day One, pg.112 ln.5-13,
     Trial Tr. Day Two pg.144 ln.24-25, Trial Tr. Day Two
     pg. 146-147 ln.14-8 & Trial Tr. Day Two pg. 146-147
     ln.14-8, & pg.147-148 ln.22-11.*

69.  Dr. Henkin reviewed an MRI of the plaintiff's brain
     which was within normal limits. *Trial Tr. Day Two
     pg. 155 ln.15-18.*

70.  Dr. Henkin's two-day examination revealed that the
     plaintiff was able to detect tastes, but she was
     unable to recognize the tastants [Hypogeusia-Type I].
     Dr. Henkin's examination also revealed that the
     plaintiff's olfactory system was intact because she
     could detect and recognize some odors [Hyposmia-Type
     II]. Dr. Henkin's also diagnosed the plaintiff with
     hypothyroidism.  Dr. Henkin provided the plaintiff
     with a prescription for Synthroid®, which is a
     medication to treat hypothyroidism. *Trial Tr. Day
     One pg.113-114 ln.10-4, pg.116 ln.8-24, pg.118 ln.5-*

*21, & Trial Tr. Day Two pg.153 ln.10-20, pg.163-164*
*ln.23-4, pg.165-166 ln.11-4, pg.173 ln.3-15.*

71. After her examination at the Center for Molecular
    Nutrition and Sensory Disorders – Taste and Smell
    Clinic, the plaintiff consulted her primary care
    physician in Florida, Eric Schertzer, M.D.
    Thereafter, she began taking Synthroid® to treat her
    hypothyroidism.  Some two [2] months after taking
    Synthroid®, the plaintiff became aware of an odor,
    but was unable to recognize it as cigarette smoke.
    *Trial Tr. Day One pg.119-120 ln.1-19.*

72. On November 17, 2006, the plaintiff traveled to
    Chicago, Illinois for one day of smell and taste
    testing performed by Dr. Hirsch, who is the sole
    owner of the Smell and Taste Treatment and Research
    Foundation.  *Trial Tr. Day One pg.124 ln.6-22 & Trial*
    *Tr. Day Two pg.16 ln.7-18 & pg.31 ln.1-3.*

73. The plaintiff informed Dr. Hirsch that after starting
    Synthroid® her smell improved and she noticed more
    smells, but she still was unable to identify what the
    smells were. The plaintiff also reported to Dr.
    Hirsch that "after the trauma her smell was at a five
    percent [5%] level".  During Dr. Hirsch's examination
    of the plaintiff in November 2006, the plaintiff

thought that her smell was at about a twenty percent

[20%] level. The plaintiff informed Dr. Hirsch that

she "can smell some, but not all odors." *Trial Tr.*

*Day Two pg.45 ln.10-23 & pg.96 ln.18-22.*

74. After examining the plaintiff and testing her taste

and smell, Dr. Hirsch concluded that the plaintiff

had cacosmia, [misperceived smell], hyposmia [reduced

ability to smell], ageusia [absence of ability to

taste], and phantosmia [hallucinated smells].  Dr.

Hirsch thought these conditions were post-traumatic

in origin superimposed upon by the plaintiff's

hypothyroidism. Dr. Hirsch opined that the

plaintiff's loss of smell and taste was trauma

induced and permanent in nature.  *Trial Tr. Day Two*

*pg.63 ln.13-24 & pg.68 ln.8-20.*

75. Dr. Hirsch further opined that the plaintiff's loss

of smell resulted from a "shearing of the olfactory

nerve as it goes through the cribriform plate", but

this opinion does not appear in his expert report nor

does he "believe all of the olfactory nerves were

severed." *Trial Tr. Day Two pg.61 ln.1-8, pg.98*

*ln.15-18, & pg.107 ln.13-18.*

76. When questioned about his review of a medical report

from Ronald S. Wagner, M.D. from Pompano Beach

Florida, which was appended to his expert report, Dr. Hirsch had difficulty interpreting whether the plaintiff's alleged loss of taste and smell occurred after the sailing incident on July 5, 2002 or after her fall at Brant Point on August 8, 2002. *Trial Tr. Day Two pg.111-113 ln.1-13.*

77. Dr. Hirsch confirmed that during his examination of the plaintiff he did not perform a magnetic resonance imaging (MRI) to confirm the shearing of her olfactory nerve. *Trial Tr. Day Two pg.130 ln.1-11.*

78. At trial, Dr. Hirsch concurred that a person can have hypothyroidism and not know that she has it. *Trial Tr. Day Two pg.102 ln.4-7.*

79. Dr. Hirsch did not perform any test to determine whether the plaintiff had hypothyroidism despite his knowledge of Dr. Henkin's opinions and previous diagnosis. *Trial Tr. Day Two pg.101 ln.6-23 & pg.103 ln.17-19.*

80. Dr. Hirsch concurred at trial that the sense of taste is ninety percent [90%] smell. *Trial Tr. Day Two pg.62 ln.21-23.*

81. Dr. Hirsch concurred at trial that "clearly hypothyroidism causes a smell loss and a taste loss." *Trial Tr. Day Two pg.106 ln.21-25.*

82. Dr. Hirsch acknowledged that the plaintiff's hypothyroidism can be treated successfully with medication. *Trial Tr. Day Two pg.114 ln.1-5.*

83. As of the first day of trial, November 13, 2007, the plaintiff continued to take Synthroid® to treat her hypothyroidism.  After taking Synthroid®, she noticed an improvement in her smell, but she testified that she did not "really smell anything" and she did not experience any "phantom smells anymore." *Trial Tr. Day One pg.122-123 ln.17-15.*

84. The plaintiff alleges that her loss of smell effects her enjoyment of life because she unable to adequately maintain her personal hygiene, smell her own cooking or smoke from a fire.  She also contends that she cannot smell lawns, children or men. *Trial Tr. Day One pg.127-130 ln.9-5.*

85. The plaintiff alleges that her loss of taste effects her enjoyment of life because it is difficult for her to go to dinner with friends and not taste her food and drink.  She further alleges that she gained weight when she attempted to eat more than she did before the events of July 5, 2002. *Trial Tr. Day One pg.130-132 ln.11-1.*

### DEFENDANT' POST TRIAL
### ARGUMENT AND LEGAL AUTHORITY

To prove negligence under the controlling General Maritime Law, the plaintiff must establish the applicable standard of care and that the defendants breached said standard of care, which proximately caused her injuries. *Kain v. S/S Vjazma*, 1977 A.M.C. 415, 420 (E.D. La. 1977), *aff'd*, 612 F.2d 577 (5th Cir. 1980). It is well-settled under the General Maritime Law that the mere happening of an accident is not evidence of negligence. *Wm. L. Prosser, Law of Torts* §§ 39-40, p. 39-40 (4th ed. 1984); *Force and Norris, The Law of Maritime Personal Injuries* § 8:11, at 8-21 (5th ed. 2004); *Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767, 1989 A.M.C. 330, 333 (9th Cir. 1988) (*negligence cannot be presumed, it must be proven*).

In her Amended Complaint, the plaintiff alleges that the defendants, O'Siochru and Kiely, owed a duty to the plaintiff by providing her "a safe leisurely sailing experience." *See Paragraph 13 of the plaintiff's Amended Complaint*. The plaintiff further alleges that O'Siochru and Kiely breached their duty of care "by racing and not steering away from a clear collision course …." *See Paragraph 14 of the plaintiff's Amended Complaint*.

Finally, the plaintiff also alleges that O'Siochru breached the aforementioned duty of care "by failing to yield and to give way when [Kiely] had the clear right of way." *See Paragraph 15 of the plaintiff's Amended Complaint*.

The plaintiff has offered no evidence that the defendants breached an alleged duty to provide her with a "leisurely sailing experience." To the contrary, the weight of the evidence submitted to this Honorable Court supports the conclusion that on Friday, July 5, 2002 at approximately 5:30 p.m. the defendants and the plaintiff were willing participants in the "Friday Night Laser Series", which was a series of laser sailboat races open to the general public. In further support of this conclusion, the defendants refer to the newspaper advertisements, which publicized the events and caused the plaintiff to travel to Jetty's Beach. Further, Mr. O'Siochru uncontroverted testimony was that he never participated in sailing lessons after 5:30 or 6:00 in the evening and O'Siochru understood that the plaintiff had sailing experience, knew how to sail, and she was to be his "crew for the races." Accordingly, the defendants submit that the weight of the evidence supports the conclusion that the plaintiff was a willful participant in sailboat racing on July 5, 2002.

**THE RULES OF THE ROAD**

As a sailboat race participant, Mr. O'Siochru understood that the "racing rules follow[ed] the same as maritime rules to avoid collisions at sea."   Evidence at trial also supports the conclusion that prior to the onset of the race, there was no meeting between the sailboat racing participants to discuss navigational rules.   The First Circuit Court of Appeals has held that "by entering a regatta with sailing instructions which unambiguously set forth special, binding "rules of the road," the participants waive conflicting COLREGS[1] and must sail in accordance with the agreed-upon rules." *Juno SRL v. S/V ENDEAVOUR*, 58 F.3d 1, 4-5 (1st Cir 1995).   Given the First Circuit's holding in *Juno SRL*, it logically follows that where sailboat racing participants fail to hold a pre-race meeting to discuss and establish "agreed-upon rules" for racing within the navigable waters of the United States, the COLREGS govern the race's activities and the duty of care owed to each participant.

*33 U.S.C.A. § 2001(a) [Rule 1],* clearly and unequivocally states that:

> These Rules apply to all vessels upon the inland waters
> of the United States, and to vessels of the United
> States on the Canadian waters of the Great Lakes to the
> extent that there is no conflict with Canadian law.

---

[1] Convention on the International Regulation for the Prevention of Collisions at Sea ("COLREGS"), 33 U.S.C. §§ 1601 *et seq.,* 33 C.F.R. § 80.01 *et seq.*

The defendants submit that the evidence at trial supports the conclusion that the subject sailboat activity off Jetty's Beach on July 5, 2002 occurred some several hundred feet from the beach, which was within "inland waters of the United States." *Id.* Accordingly, the defendants submit that the COLREGS are applicable to the circumstances governing the sailboat racing activity during which the plaintiff allegedly lost her senses of taste and smell.

The duty of care between boats and the plaintiff falls under *33 U.S.C.A. § 2002(a) [Rule 2],* whereby the participants are responsible for the consequences of any neglect to comply with the Rules or the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

On July 5, 2002, O'Siochru and Kiely boats were operated without the assistance of any instrumentation to assist in the measure their boats' actual and relative speeds, angle of approach, drift, or the actual and apparent directions of the wind. The boats were sailed based upon O'Siochru's and Kiely's sailing experience, the variable effects of the wind and sea, and O'Siochru's and Kiely's judgment.

As the boats approached the subject windward mark, the first applicable Rule of the Road was Inland Rule 12.  This Inland Rule requires:

> ***When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other … (i) when each has the wind on a different side, the vessel which has the wind on the port side shall keep out of the way of the other.***
>
> ***33 U.S.C.A. § 2012(a)(1) [Rule 12]***

It was incumbent upon O'Siochru, as the boat with the wind on the port side, to keep out of the way of Kiely's boat, if he could do so.  *See **THE MAUD WEBSTER***, 16 F.Cas. 1160, 1162 (D.Me. Feb 1871).

In observance with Rule 12, O'Siochru understood that "[i]f you're the stand-on vessel, it's your obligation to hold course until such time as you believe that a collision will occur unless an alteration of course by both vessels…." Accordingly, O'Siochru "pulled the tiller slightly towards [himself] and off enough to ensure that the boats were not going to collide" and therefore, he  maintained the distance between the two boats by some two to three [2-3] feet in accordance with Rule 12.

As the boats neared the subject windward mark some five to ten meters away, Kiely's boat began to overtake

O'Siochru's boat and required the application of Inland Rule

13. *33 U.S.C.A. § 2013 [Rule 13]* clearly states that:

> *(a)  Overtaking vessel to keep out of the overtaken vessel's way*
>
> *Notwithstanding anything contained in Rules 4 through 18, any vessel overtaking any other shall keep out of the way of the vessel being overtaken.*
>
> *(c)  Assumption that vessel is overtaking another in cases of doubt*
>
> *When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly.*

As O'Siochru maintained the distance between the two boats, Kiely's boat, as the overtaking vessel, was required to keep clear of O'Siochru's boat.  Kiely believed that "there may potentially be a collision at some stage as the boats advanced and therefore …" in accordance with Rule 13, Kiely jibed his boat to avoid a collision "further down the course."   Accordingly, at the time Kiely's boat jibed, both O'Siochru and Kiely were operating their boats in compliance with the applicable Inland Rules of the Road.

As Kiely's boat jibed, he believed that its boom would clear O'Siochru's boat and the plaintiff who was sitting on the port side of the boat.  In evaluating the potential for collision, Kiely considered the distance between the boats at two [2] feet, their relative speeds, and the fact that his boat turned to port, and the length and movement of his boat

and tiller.  In considering Kiely's decision to jibe his boat, this Honorable Court should adhere to the following reasoning of the First Circuit as it evaluated the situation in ***THE H.F. DIMCOCK***:

> Where the questions are merely those of prudential rules of navigation and of maritime usages, a vessel should not ordinarily be held in fault simply because the courts, with cool deliberation, after all the facts, determine that what was done was mistaken. In such cases a court should put itself in the position of the master at the time of the circumstances involved, and consider that the rights of the parties, when maritime contingencies are difficult and unusual, must ordinarily be settled according to his determination, provided he has suitable experience and capacity, and exercises a discretion not inconsistent with sound judgment and good seamanship. ***THE H.F. DIMCOCK***, 77 F. 226, 230, 23 C.C.A. 123 (1ST Cir. 1896).

Accordingly, the defendants submit that at the time of the circumstances involved, both O'Siochru and Kiely were operating within the standard of care detailed in the Inland Navigation Rules.  The fact that Kiely's boom struck the plaintiff was an unfortunate incident resulting from an *error of judgment* whereby Kiely mistakenly believed his boom would clear O'Siochru boat and the plaintiff.

The defendants further submit that the plaintiff has failed to offer any evidence that the defendants were not operating within the applicable navigation rules, with sound judgment, and good seamanship.

The plaintiff alleges in her Amended Complaint that
O'Siochru and Kiely breached their duty of care by "not
steering away from a clear collision course."  Further, the
plaintiff alleges that O'Siochru failed to yield and to give
way when Kiely's boat had the clear right of way.  The
evidence at trial clearly contradicts these allegations since
under Rule 12 O'Siochru was required to keep out of the way
of Kiely's boat and did so.  In addition, in adherence to
Rule 13, when Kiely had doubts about keeping out of the way
of O'Siochru's boat, he acted accordingly and jibed his boat.
The plaintiff has not offered any support or expert opinion
as to whether the defendants' aforementioned actions violated
the applicable standard of care in anyway.  She merely relies
upon the factual conclusion that Kiely's boom struck the back
of her neck to support her allegations of a breach of duty.
As a result, it is impossible for this Honorable Court to
conclude on the evidence submitted at trial to conclude that
the defendants breached any applicable standard of care
without engaging in pure speculation or conjecture.  *See
Goldhirsh Group v. Alpert,* 107 F.3d 105, 108 (2d Cir.1997)
(quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534
F.2d 1036, 1042 (2d Cir.1976)).   In order to present a
question for the trier of fact, the plaintiff must present
more than a mere scintilla of evidence. *Doucet v. Diamond M*

*Drilling Co.*, 683 F.2d 886, 889, 1983 A.M.C. 2999 (5th Cir. 1982) (holding a mere scintilla of evidence insufficient to present the question to the trier of fact). Since there is no competent evidence before this Honorable Court to support a finding of breach of duty by the defendants, this Honorable Court should properly enter Judgment on Partial Findings for the defendants. *See* **Morales** at 59 *citing to* **9A Charles Alan Wright & Arthur R. Miller**, **Federal Practice & Procedure §**
**2573.1** (2d ed.1994), at 497-99 (*noting that the court's task under Rule 52(c) is to weigh the evidence, without drawing any special inferences in the nonmovant's favor, resolve any conflicts in the evidence, and "decide for itself where the preponderance lies"*).

**CAUSATION**

Assuming this Honorable Court determines that the defendants breached some duty of care to the plaintiff, the defendants submit that the plaintiff has failed to establish that it is more probable than not that her diminished senses of taste and smell were caused by the events occurring on July 5, 2002. **Samos Imex Corp. v. Nextel Communications**, Inc., 194 F.3d 301, 303 (1st Cir. 1999).

In support of their position, the defendants submit that the plaintiff's own expert, Alan R. Hirsch, M.D.,

examined her medical records from Nantucket Cottage
Hospital and failed to discover any diagnosis that she
suffered a concussion on July 5, 2002.  At trial, Dr.
Hirsch had difficulty interpreting whether the plaintiff's
alleged loss of taste and smell occurred after the sailing
incident on July 5, 2002 or after her fall at Brant Point
on August 8, 2002.

The plaintiff reports that she never reported her
loss of smell and taste to the medical staff at Nantucket
Cottage Hospital despite visiting the facility on several
occasions.  She testified that she informed a physician's
assistant working with Michael Ackland, M.D. about her
loss of taste and smell on September 18, 2002. Yet, Dr.
Ackland's medical records are devoid of any mention of
loss of smell and taste.  At trial, Dr. Ackland doubted
that he ever told the plaintiff that her loss of smell and
taste was a permanent condition and further clarified that
"it would be crazy for [him] to say that" to the
plaintiff.  Accordingly, the weight of the evidence
suggests that plaintiff never complained of a loss of
smell and taste until substantially after the events of
July 5, 2002.

Further, Dr. Hirsch concluded the plaintiff's
conditions were post-traumatic in origin superimposed upon

the plaintiff's hypothyroidism.  However, Dr. Hirsch
confirmed that during his examination of the plaintiff he
did not perform a magnetic resonance imaging (MRI) to
confirm the purported shearing or severing of the
plaintiff's olfactory nerve.  Dr. Hirsch provided no
objective basis to support his conclusion that the
plaintiff's olfactory nerve was sheared or severed as a
result of the events of July 5, 2002.  In point of fact,
Dr. Hirsch finds diminished sense of taste and smell which
refute his purported finding of shearing or severing of
the plaintiff's olfactory nerve.

     To the contrary, Dr. Hirsch supported the opinions of
Robert I. Henkin, M.D., Ph.D. by concurring that a person
can have hypothyroidism and not know that she has it.  Dr.
Hirsch did not perform any test to determine whether the
plaintiff had hypothyroidism despite his knowledge of Dr.
Henkin's several blood tests, opinions, and previous
diagnosis that the plaintiff suffered from hypothyroidism.
Dr. Hirsch also concurred at trial that "clearly
hypothyroidism causes a smell loss and a taste loss."  Dr.
Hirsch acknowledged that the plaintiff's hypothyroidism
can be treated successfully with medication.  The
plaintiff herself reported that after taking Synthroid®,
she noticed an improvement in her smell and she continues

to take Synthroid® after consulting with her primary care physician in Florida, Eric Schertzer, M.D.

Accordingly, the defendants submit that the weight of evidence at trial supports the conclusion that the plaintiff's diminished senses of smell and taste result from her hypothyroidism.  In the alternative, the defendants submit that the plaintiff and her expert, Dr. Hirsch, failed to proffer sufficient evidence to support the conclusion that it is more probable than not that her diminished senses of smell and taste result from a shearing or severing of her olfactory nerve which occurred when she was struck by the boom of Kiely's boat on the back of her neck.

On December 8, 2005, the plaintiff's deposition was obtained.  Prior to the deposition and *in plaintiff's presence*, a colloquy on the record between defense counsel and the plaintiff's predecessor counsel, Steven D. Miller, occurred. The plaintiff's counsel stipulated that [1] the only claim presented in this action was for loss of taste and smell; [2] the plaintiff was not seeking loss of earning capacity, either past or future; and [3] limit medical expenses relating to the loss of taste and smell. After conducting a hearing on October 24, 2006, this Honorable Court denied plaintiff's Motion to Revoke

Stipulation Limiting Claims for Damages to Those Related to Loss of Taste and Smell and therefore, the plaintiff was not relieved from the parameters of the stipulation. In our judicial system, "[s]tipulations fairly entered into are favored." *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995) *quoting* *Burstein v. United States*, 232 F.2d 19, 23 (8th Cir. 1956). Factual stipulations tend to "expedite a trial and eliminate the necessity of much tedious proof." *Id.* As a result, "parties to a lawsuit are free to stipulate to factual matters." *TI Federal Credit Union* at 928 *quoting* *Saviano v. Commissioner of Internal Revenue*, 765 F.2d 643, 645 (7th Cir. 1985). Accordingly, this Honorable Court should properly preclude the plaintiff from recovering any damages beyond the scope of the Stipulation of December 8, 2005.

If this Honorable Court finds that the defendants breached their duty of care to the plaintiff, and her diminished senses of smell and taste were caused by the events of July 5, 2002, the defendants submit that the plaintiff has failed to proffer any evidence to support a considerable monetary award for someone of her age and life expectancy. The evidence at trial supports a finding that the plaintiff suffered a diminished sense of smell and a

diminished sense of taste since Dr. Hirsch opined that the sense of taste is ninety percent [90%] smell and the plaintiff testified that she noticed an improvement in her smell after taking Synthroid.  On July 5, 2002 the plaintiff was nearly forty [40] years old.  She offered no evidence of life expectancy and therefore the trier of fact is without the benefit of this yardstick.

**COMPARATIVE FAULT**

Any award of damages to the plaintiff for the events of July 5, 2002 must be reduced under the General Maritime Law by a percentage corresponding to her comparative fault.  *See Lovuolo v. Gunning*, 925 F.2d 22, 28 (1st Cir. 1991) *citing to United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708 (1975).  The defendants submit that the evidence at trial suggests that the plaintiff misrepresented her sailing abilities to Mr. O'Siochru before boarding the sailboat on the evening of July 5, 2002.   In addition, the plaintiff knew or should have known that during the course of the sailboat race that the participating boats were in close proximity to each and she had a duty to herself to pay attention to the events developing around her.  At trial, the plaintiff testified that she was not really paying attention at times.  Prior to being struck by the boom of Kiely's boat, the plaintiff failed to see Kiely's boat approaching and

therefore, she was unable to avoid the swinging boom.
Accordingly, the defendants submit that the plaintiff's
misrepresentations and failure to keep a lookout for herself
should reasonably result in a reduction of any award by a
substantial amount for her comparative fault.

### PROPOSED CONCLUSIONS OF LAW

1.   This Honorable Court has jurisdiction of this action
     alleging a tort occurring on the navigable waters of
     the United States with an appropriate maritime nexus.

2.   The plaintiff has the burden of proving by a
     preponderance of the evidence that defendants were
     negligent in the operation of their sailboats and
     that such negligence was the proximate cause of her
     alleged loss of smell and taste.

3.   Under the General Maritime Law of the United States,
     the mere happening of an accident is not evidence of
     negligence.

4.   This Court finds that the plaintiff failed to show by
     a preponderance of the credible evidence that
     O'Siochru's boat was operated in a negligent manner
     or he violated the exercise of sound judgment and
     good seamanship or the standard of operation under
     the Inland COLREGS.

5.   This Court further finds that the plaintiff failed to
     show by a preponderance of the credible evidence that
     Kiely's boat was operated in a negligent manner or he
     violated the exercise of sound judgment and good
     seamanship or the standard of operation under the
     Inland COLREGS.

6.   This Court enters Judgment in favor of the
     defendants, Ronan O'Siochru and Donncha Kiely.

*In the alternative and if the Court finds liability:*

7.   This Court finds that the plaintiff failed to show by
     a preponderance of the credible evidence that
     O'Siochru's boat was operated in a negligent manner
     or he violated the exercise of sound judgment and
     good seamanship or the standard of operation under
     the Inland COLREGS.

8.   This Court further finds that the plaintiff's injury
     is attributable to Kiely's error of judgment at the
     time when he jibed his vessel as required under Rule
     13 of the Inland COLREGS.  The credible evidence

supports that Kiely's boat was operated in the exercise of sound judgment and good seamanship.

9.   This Court enters Judgment in favor of the defendants, Ronan O'Siochru and Donncha Kiely.

*In the alternative and if the Court finds liability without exculpatory error of judgment:*

10.  This Court finds that the plaintiff failed to show by a preponderance of the credible evidence that the loss of smell and taste was the direct result of the trauma to the back of her neck on July 5, 2002.

11.  This Court finds that the credible evidence supports a finding that the plaintiff's diminished sense of taste and smell was and is a result of an un-noticed hypothyroidism condition which is treated successfully with Synthroid medication.

12.  This Court enters Judgment in favor of the defendants, Ronan O'Siochru and Donncha Kiely.

*In the alternative and if the Court finds liability with causation:*

13.  This Court finds by a preponderance of the credible evidence that the plaintiff failed to exercise the degree of reasonable care for a person of her age and experience to protect herself and avoid the potential risk of harm while participating in a sail boat race. This Court finds the plaintiff _____ % at fault.

14.  This Court finds that the credible evidence supports a finding that the plaintiff's diminished sense of taste and smell was and is deminimis and requires an award of minimal damages in the amount of $_____.

15.  This Court enters Judgment in favor of the plaintiff in the amount of $ _____ reduced by her comparative fault for a net recovery of $ _____.

16.  This Court does not award pre-judgment interest due to the plaintiff's delay of the trial by intervening and activities and substitution of trial counsel.

**WHEREFORE**, the defendants respectfully submit their Proposed Findings of Fact and Conclusions of Law for this Honorable Court's consideration and pursuant to its Order of December 11, 2007 and its subsequent extension.  The defendants respectfully request that judgment be entered on their behalf and the plaintiff's Amended Complaint be dismissed.

Respectfully submitted,
**CLINTON & MUZYKA, P.C.**

"/s/Thomas J. Muzyka"_
**Thomas J. Muzyka**
**BBO NO. 365540**
**Terence G. Kenneally**
**BBO NO: 642124**
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

Dated:  April 10, 2008