UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.: 05-10088 MBB

JULIANNE MARIE EVANS,    *
                                   *
       Plaintiff,    *
                                   *
                                   *
vs.    *
                                   *
                                   *
RONAN O'SIOCHRU and    *
DONNCHA KIELY,    *
                                   *
       Defendants.    *

**PLAINTIFF'S REVISED REQUESTS FOR FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

I. **REQUESTED FINDINGS OF FACT**

     A. **Testimony of Julianne Evans**

1. Julianne Evans ("Evans") was born on October 23, 1962 and was 39 years old on July 5, 2002.

2. Prior to the incident of July 5, 2002, Evans was a licensed realtor with interests in cooking, dining out in restaurants, gardening and birding (T. I: 43-48, 53).

3. Before July 5, 2002, Evans had no difficulty with smell or taste (T. I: 57).

4. As a pre-teenager, Evans had sailed with her father. After age 12, she sailed on only one occasion, as a passenger, in 1985 (T.I: 59-60).

5. On July 5, 2002, Evans saw an article in a Nantucket newspaper for sailing and barbecuing that night at Jette's Beach. She called the number for the Nantucket Sailing Club and asked to take sailing lessens. She was told it would cost $300.00 and that she could go to Jette's Beach that night at 5:00 p.m. to ask to take a sailing lesson (T. I:61).

6. Evans went to Jette's Beach at 5:00 p.m. and met Darragh Connolly ("Connolly") who was in charge of the sailing club and the sailing event. Connolly told her she could take a sailing lesson. She told Connolly she had not sailed in 20 years. Connolly directed her to Ronan O'Siochru ("O'Siochru") one of his sailing instructors. Connolly told O'Siochru that Evans wanted to take a sailing lesson and that she had not sailed in 20 years. O'Siochru took Evans out on one of the sailboats (T. I: 62-66).

7. O'Siochru was preparing the boat for a sail and began to give Evans some minor sailing instructions. They were sailing for a total of about 15-20 minutes before the incident occurred (T. I: 66-67).

8. After they had been on the boat for a short period of time, another boat approached their boat and the operator of the other boat, whom Evans later learned was Donncha Kiely ("Kiely"), told O'Siochru that the races were starting. O'Siochru told Kiely he was giving Evans some lessons and that she hadn't sailed in 20 years. O'Siochru told Kiely he would be there eventually (T. I: 67-68).

9. Evans was sitting on the edge of the boat about one-third of the way in from the front of the boat. O'Siochru was in the back of the boat (T. I: 69).

10. The other boat was behind them to their left (T. I: 69).

11. The next thing Evans knew, O'Siochru loudly yelled "jibe" and then "f-u-c-k". Evans felt a bump from the other boat, which was jibing as well. Then she was hit across the back of the neck by the boom of Kiely's sailboat. She was then propelled head first into the keel of the boat (T. I: 70).

12. Other than yelling "jibe" and swearing, O'Siochru gave Evans no warning of the impending impact (T. I: 72).

13. Evans lost consciousness. She did not move for five and one-half hours after she woke up. She basically slept for the next 10 days (T. I: 72-74).

14. While Evans was recuperating, Kiely came to see her and apologized, telling her he was very sorry that he hit her (T. I: 75).

15. Evans saw O'Siochru at the beach about two weeks after the incident. He told her it was his fault (T. I: 77-78).

16. About 10 days after the incident, Evans realized she could not smell her dog's feces. Around the end of July she began to realize her food tasted bland. She kept adding salt to it to attempt to enhance its taste. She was also having serious problems with her neck and back (T. I: 78-81).

17. Evans had difficulty seeing a physician on Nantucket as they were all booked. She had been advised she could not take the ferry off the island due to her neck injury. She had another incident when she fell in the sand on August 8, 2002 and badly injured her ankle and wrist. There was no trauma to her head on August 8, 2002 and there was no medical testimony at trial that the fall on August 8, 2002 was related in anyway to Evans' loss of taste and smell. She was, at that point, coping with injuries to her neck, ankle, back and wrist (the fractured wrist was diagnosed on August 28, 2002) and she did not realize that she had actually lost her taste and smell. For that reason, she did not mention her loss of taste and smell to any medical providers until she told a physician's assistant to Dr. Ackland in September 2002 (T. I: 81-90; Plaintiff's Exhibit 3).

18. She told Dr. Ackland that she could not taste or smell. When he learned that that had lasted for several months, he told her they were not coming back (T. I: 91-92).

19. By April 2003, Evans had still not regained any taste or smell. She saw Dr. Rosomoff, a neurologist at the University of Miami. She told him she had lost her taste and smell. He did not prescribe any treatment (T. I: 104-05).

20. In connection with this litigation, Evans saw Dr. Mann at the University of Connecticut in October 2004. She underwent three days of taste and smell testing. Dr. Mann told her she had a substantial, permanent loss of taste and smell as a result of the head injury and that there was no treatment for it. (T. I: 106-110).

21. Eight months later, she saw Dr. Henkin, another expert retained by the defendant. She spent two days with him. Dr. Henkin told her her taste was gone and there was nothing he could do about it. He said her smell was severely diminished and distorted. He said he had only seen two patients like her in 47 years of medical practice. He said her losses were due to her head injury. He said he could give her some medicine for hypothyroidism, which might help her sense of smell if her condition were thyroid-related. He told her she had ageusia, total loss of taste, and hyposmia, a distorted sense of smell. He told her these conditions had occurred due to post-concussive syndrome (T. I: 111-115).

22. Evans began taking Synthroid, a thyroid medication. About two months later she temporarily became aware of odors on occasion. Whenever she smelled anything, it would be a revolting smell (T. I: 119-120).

23. As of the time of trial, her sense of smell had returned to its previous condition – she virtually smells nothing even though she has continued to take the Synthroid (T. I: 122-123).

24. Evans next saw Dr. Hirsch, an expert retained by the plaintiff, who also tested her. Hirsch told her there was no treatment for her losses of taste and smell. Every physician she has seen has told her her losses are permanent (T. I: 124-127).

25. Evans has been unable to smell a gynecological infection and a fire in her stove. She worries about her personal hygiene and personal safety (T. I: 127-130).

26. Her losses of taste and smell have changed her entire life. She does not enjoy restaurants, she cannot taste wine and she has gained 25 pounds as she overeats to try to taste food. She cannot smell grass, a baby or a man. Her losses affect her in numerous ways (T. I: 130-132).

27. Nantucket Community Sailing ("NCS") advertised the Friday night event, placing two advertisements in the local Nantucket newspaper, which provided as follows:

> **Sailing**: Nantucket Community Sailing will offer Friday night races in Lasers and Hunter 140s for people of all ages who know how to sail and are interested in being involved with racing. Races are open to the public, but are bring your own boat, though NCS does have a few Lasers available for its members. The race series will begin this Friday evening and continue through Labor Day. Activities will begin at 5:30 p.m. NCS is now accepting registration for their Adult Instructional Sailing and Open Sailing programs. For information, or to register, call (508) 228-6600, or check www.nantucketcommunitysailing.org. (Defendant's Exhibit A).

A second advertisement of the activities indicated that the race would begin after 8:00 p.m. and that NCS would provide grills for barbeque as follows:

> **FRIDAY NIGHT LASER SERIES:** Sunset, 8 p.m. at Jetties Beach, Nantucket Community Sailing's begins the Friday Night Laser Series (weather permitting). The laser sailboat races are open to the public. BYO Boat; a few lasers will be available to be shared by members of NCS. There will also be sailing/racing 420's and Hunter 140's. Bring food supplies to barbeque (NCS will provide a grill). Every Friday through August 16th. Call NCS at (508) 228-6600 for sign up and for information. (Plaintiff's Exhibit 1).

28. Evans never saw the first advertisement (T. III: 8-10). She saw the second advertisement and, accordingly, believed the races were to start at 8:00 p.m. Thus, when she began to take her sailing lesson at about 5:00 p.m. on the night of the incident, she did not believe she was engaged in a sailing race (T. III: 52-53).

29. When she had spoken with NCS on July 5, 2002, she had been told the sailing lesson that night would be free. She expected to become a member of the club by paying $300.00 to join on the following Monday (T. III: 17-18).

30. In the first 10 or 15 minutes of sailing with O'Siochru, he was giving Evans a sailing lesson (T. III: 19-21). She had no awareness that the boat at some point became engaged in a race (T. III: 21).

31. Evans did not see the other boat until O'Siochru yelled. She believes the other boat contacted their boat (T. III: 31).

32. As far as she recalls, Evans was never told by O'Siochru that they were participating in a race (T. III: 57).

33. O'Siochru never warned Evans that she could be hurt by other boats and their booms (T. III: 57).

### B.     Testimony of Dr. Alan Hirsch

34. Dr. Hirsch is a board certified neurologist and psychiatrist (T. II: 5). His area of interest is taste and smell (T. II: 7; Defendant's Exhibit G).

35. Dr. Hirsch spent a day with Evans. He did a physical examination and took a history. He did a psychological examination and conducted a battery of tests. He reviewed her medical records and the report of defendant's expert Dr. Henkin. He reviewed Dr. Mann's records and findings (T. II: 29-50).

36. In Dr. Hirsch's psychological testing, he concluded that Evans showed an absence of psychosis, an absence of major depression and an absence of malingering. Her thought content and thought processes were normal (T. II: 51-52).

37. Dr. Hirsch conducted numerous tests relating to Evans' sense of smell (T. II:54-57). He diagnosed her with cacosmia, the misperception of smell, severe hyposmia, sharply reduced ability to smell, and phantosmia, hallucinated smells (T. II: 63, 97).

38. Dr. Hirsch also conducted numerous tests relating to Evans' sense of taste. He diagnosed her with ageusia, absence of the ability to taste (T. II: 61-63).

39. Dr. Hirsch concluded that Evans sustained post-concussive syndrome, resulting in a trauma induced loss of smell and taste (T. II: 66-68).

40. It is Dr. Hirsch's opinion that Evans' condition is permanent. She sustained a shearing of the olfactory nerve, and there is no treatment which will help her recover her taste or smell (T. II: 68-69).

41. Dr. Hirsch also reviewed records relating to Dr. Selbst's testing of Evans' thyroid function in September 2005. At that time, her thyroid function was normal. There is no evidence that Evans suffered from hypothyroidism in 2005 or at any time prior thereto. Dr. Henkin concluded that Evans suffered from hypothyroidism in 2006. It is medically impossible for her hypothyroidism to be a contributing cause of her loss of taste or smell because she did not suffer from hypothyroidism prior to 2006 (T. II: 74-78).

42. Dr. Hirsch concluded that the cause of Evans' hyposmia is being struck by the boom when she was on the boat (T. II: 109-110).

43. Dr. Hirsch agrees with other physicians who have opined that Evans' loss of taste and smell resulted from the incident of July 5, 2002. These physicians include Dr. Rosomoff, a neurosurgeon, and Dr. Flaten, a physician she saw at the request of the insurance company.

### C.    Testimony of Janice Chamberlain

44. Ms. Chamberlain is Evans' twin (T. II: 133).

45. Prior to the incident, Evans was bubbly, vivacious, outgoing, assertive, fun and exciting. She would light up a room. She was very loving and had many friends. She enjoyed cooking and eating out at restaurants. She had no problems with taste or smell (T. II: 135-137).

46. Since the incident, Evans has been distraught about her lack of senses of smell and taste. She is obsessed about these losses and it is very difficult to be with her. She cries a lot and she's very sad. She is not the same and she's hard to be around (T. II: 138-141).

### D.    Testimony of Dr. Robert Henkin

47. Dr. Henkin is a medical expert who evaluated Evans on behalf of the defendants (T. II: 148). He performed taste and smell testing (T. II: 151).

48. Dr. Henkin concluded that Evans suffered from post-concussive syndrome resulting in severe Type II hyposmia, diminished sense of smell and Type I

      hypogeusia, inability to recognize tastes, and phantosmia, distortion of smell (T. II: 178-181).

49.    In connection with his testing, Evans was as helpful as possible and tried the best she could (T. II: 189).

### E.    Testimony of Julia Anderson

50.    Julia Anderson is a close friend of Evans. Before the incident, Evans was very generous, loved children, intelligent, interesting, adventurous and assertive (T. III: 108).

51.    Anderson visited Evans on Nantucket from July 25 to 29, 2002. Evans kept complaining that her food was bland and that she couldn't taste it. She continually complained about her food and tried to season it excessively so she could taste it. It was embarrassing, annoying and frustrating. Since the incident, Anderson has observed numerous instances of Evans' inability to taste and smell (T. III: 110-120).

### F.    Testimony of Ronan O'Siochru

52.    O'Siochru, who was 19 years old at the time of the incident, learned sailing as a teenager in Ireland. One of the things he learned was that the boom of a boat could swing across and hurt someone. He would warn crew members about such maneuvers. He knew that people could get hit on the head by a boom. He had seen it from time to time before he came to Nantucket. He knew whenever he went sailing that there is the potential for a person to be struck by a boom. He knew this since he was 12 (T. III: 129-137).

53.    He came to Nantucket to be a sailing instructor for NCS. He had been an assistant instructor previously. He was paid by the hour by NCS. He participated in informal racing events on Friday nights. These were community-based events in which all the instructors were eager to participate. NCS paid for the food which was barbecued. They provided grills. If people came without boats, boats would be provided by NCS. The purpose of advertising the event was to generate community interest (T. III: 147-156).

54.    On July 5, 2002, Darragh Connolly asked him to take Evans out in his boat (T. III: 159-160).

55.    The boat he was operating at the time of the incident was a Hunter 140 owned by NCS, which is an awkward boat on which to teach sailing. He showed Evans

how to move the front sail and to get out of the way of the boom when it moved. It was his responsibility, as the one in control of the boat, to make sure Evans was not injured (T. IV: 17-23).

56. Before he took Evans out sailing, she told him she hadn't sailed in some time. He took her out to observe her sailing ability. After sailing with Evans for 10-20 minutes, he observed she lacked mobility and did not move well from side to side. She told him she had problems with her legs. He concluded her sailing ability was poor and he had to tell her exactly what to do (T. IV: 26-29).

57. At the time of the incident, the wind was stronger than on other days he had gone sailing on Nantucket. To start the race, one does not come to a stop, but simply passes through an imaginary line between two fixed objects. He did this and was sailing in the race for about 10 minutes before the incident. Donncha Kiely's boat came close to his. He and Kiely had raced before. The boats came to about one and one-half to two feet apart. The two boats began to maneuver for the lead (T. IV: 30-48).

58. At the time of the incident, he was familiar with the international rules of sailing. The purpose of the rules is for the prevention of collisions. Immediately before Kiely's boom struck Evans' head, O'Siochru was operating the "give-way" vessel. Under the international rules of racing, O'Siochru had the obligation to avoid Kiely's vessel, which was the "stand-on" vessel (T. IV: 48-51).

59. Immediately before the incident, he did not say anything to Evans. He pulled the tiller so that the boats would not collide. If he felt that continuing the race were too dangerous, he could have stopped. He recognized that if Kiely were to jibe his boat, there could be a collision. He recognized that Evans' head was extended outside the boat. He had an obligation to keep clear of Kiely's boat, which had the right of way. It was O'Siochru's obligation to allow enough space for Kiely's boat to pass. As he continued to maneuver his boat, he saw the boom of Kiely's boat come across his boat and the tip of his boom struck Evans on the neck (T. IV: 64).

60. Evans was not doing anything improper at the time of the incident (T. IV: 64).

61. Just prior to the incident, Kiely yelled that he had the right of way. O'Siochru acknowledged this – it was his obligation to make sure that the distance between the boats was sufficient not to impede Kiely's boat. However, O'Siochru moved into space Kiely had vacated and did not give that space back to him. After the incident, Kiely told O'Siochru that he had to jibe to avoid a collision, leaving O'Siochru to conclude that there was possibly not enough space for Kiely to pass without him having to jibe (T. IV: 66-69).

62. Before the incident, he did not warn Evans that she could get hurt. He never warned her that she could get hit by the boom of another boat. He was aware that she had a lack of ability to move from side to side (T. IV: 65-70).

63. After Evans was struck by the boom in the back of the neck, O'Siochru saw her fall over and heard her whimpering in pain. He yelled to the crash boat, which was owned by NCS, for help (T. IV: 70-71).

64. After the incident, O'Siochru admitted partial responsibility in that he broke one of the rules of racing by failing to allow the starboard boat to continue unimpeded (T. IV: 75).

65. Before the race began, O'Siochru noticed that Evans could not move from side to side under the boom with great ease. She was not as mobile as he had expected her to be. She told him she had problems with her leg which reduced her abilities. Despite knowing about these problems, he did not caution her about entering into a race (T. IV: 131-133).

### G.     Testimony of Donncha Kiely

66. NCS provided sailboats for the Friday night events. Members of the public were allowed to use boats without instructors if they were sufficiently qualified. NCS personnel made decisions based on sailing experience who would go in which boats. Darragh Connolly made those decisions (T. IV: 142-145).

67. NCS encouraged its instructors to participate in the Friday night events. The events were open to the public (T. IV: 146).

68. The boat he was operating at the time of the incident was owned by NCS. Within seconds before the incident, his boat was next to O'Siochru's boat. He yelled he had the right of way. O'Siochru never yelled anything back before the incident. O'Siochru created a small space between the boats. Kiely, noting the potential for a collision, called "Jibe". He jibed to try and avoid the collision (T. IV: 148-155).

69. In order to jibe, Kiely understood that the boom on his boat would go from left to right. There was about two feet between the boats and the boom extended about three feet beyond the perimeter of the boat. He was aware when he let go of the mainsail that the boom would come across and might hit the passenger on the other boat. He believed there was sufficient room for the boom to clear Evans. It hit her because his judgment was wrong (T. IV: 155-160).

     **H.**     **Requested Findings Based on the Evidence**

70. I find that the only credible medical testimony about causation indicates the proximate cause of Evans' losses to be as a result of her boating accident and head injury. These conditions are permanent and she will likely suffer from loss of taste and smell for the rest of her life.

71. I find that the defendants' lack of experience and age were contributing factors to the incident. O'Siochru was aware of Evans' limited sailing ability and mobility which should have alerted O'Siochru not to participate in a race with Evans on board.

72. I find that the negligence of Kiely in jibing his boat without adequately considering the danger which his boom posed to Evans was a substantial contributing cause of Evans' injuries.

73. I find that the negligence of O'Siochru in encroaching on Kiely's right of way and failing to yield to Kiely's boat in timely fashion was a substantial contributing cause of Evans' injuries.

74. I find that as a result of the combined negligence of O'Siochru and Kiely, Evans was hit by the boom of Kiely's sailboat, causing her injuries.

75. I find that at the time of the incident, Kiely and O'Siochru were acting within the scope of their employment as employees of NCS.

76. I find that at the time of the incident, Kiely and O'Siochru were performing duties related to the conduct of the business of NCS.

77. I find no evidence that any conduct of Evans was a substantial contributing cause of her injuries.

78. I find that as a result of defendants' negligence, Evans sustained a complete loss of the sense of taste.

79. I find that as a result of defendants' negligence, Evans sustained a virtually complete loss of the sense of smell.

80. I find that Evans' loss of taste is permanent.

81. I find that Evans' loss of smell is permanent.

82. I find that as a result of the incident and the resulting injuries, Evans has incurred substantial pain and suffering, loss of enjoyment of life and severe emotional distress.

83. I find that a reasonable amount of damages to compensate Evans for her past, present and future injuries is $2.5 Million.

## II. REQUESTED CONCLUSIONS OF LAW

1. Where a vessel has neglected the usual and proper measures of precaution, the burden rests on that vessel to show that the incident was not due to her negligence. The Great Republic, 90 U.S. 20 (1874); The H.F. Dimock, 77 F. 226 (1st Cir. 1896).

2. Violation of a rule of navigation is evidence of negligence and creates a presumption of liability against the vessel in violation of the rule. See The Pennsylvania, 86 U.S. 125 (1873).

3. Violation of the rules of sailing is evidence of negligence. Crowley Marine Services, Inc. v. Maritrans, Inc., 447 F.3d 719 (9th Cir. 2006).

4. A boat passenger is comparatively negligence only where she fails to exercise reasonable care for her own safety. Dodgen v. Timmons, 935 F.2d 1286 (Table)(4th Cir. 1991).

5. The conduct of an employee is within the scope of his employment if it is the kind of conduct he is expected to perform, if it occurs substantially within authorized time and space limits and if it is motivated, at least in part, by a purpose to serve the employer. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854 (1986).

6. The phrase in an insurance contract "related to the conduct" of the insured's business means any acts arising out of the conduct of the business or incidental to the business. Transcontinental Ins. Co., v. Edwards, 1996 WL 814532 (W.D. Ark. 1996).

## III. SUPPORTING LEGAL ANALYSIS

### Negligence

The defendants claim that their actions constitute excusable "errors in judgment" and are not negligent. Nothing could be further from the truth.

The defendants cite language in cases such as The H.F. Dimock, 77 F. 226 (1st Cir. 1896) and The Clarence L. Blakeslee, 243 F. 365 (2nd Cir. 1917), which bears no relation whatsoever to this case. The H.F. Dimock, for example, related to a collision between two ships in a dense fog. The court indicated that "when everything about the case indicates a reasonable degree of vigilance", the master of a ship should not be held liable, 77 F. at 231. However, because the Dimock had violated a statute and had failed to drop anchor in the deep fog, she was found at fault for the collision. Similarly, in The Clarence L. Blakeslee, involving a collision on windy and rough seas, when one ship came to the aid of another, the court indicated that although some errors in judgment may not constitute negligence, where a navigator in charge of a ship makes a decision "which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown", the navigator has acted negligently.

The instant case involves an injury incurred during the course of a recreational sailboat race, not a collision on the high seas in difficult conditions. The testimony established that the two teenagers operating the sailboats were using overly aggressive tactics of operation in an attempt to win the race. O'Siochru encroached on Kiely's right of way, resulting in Kiely executing his jibe, which injured Evans. Neither O'Siochru nor Kiely acted with appropriate concern for Evans' safety; to the contrary, they violated rules of sailing in an attempt to win the race, placing Evans in a position of unreasonable danger. Their actions easily crossed over the line of "errors of judgment" and obviously entered into the realm of negligence.

In this case, the evidence showed that O'Siochru violated the "starboard side rule". Under that rule, when two vessels are on a crossing course so as to involve a risk

of collision, the vessel which has the other vessel on her starboard side must give way to the other vessel, as required by the rules of navigation. <u>Tidewater Associated Oil Co. v. United States</u>, 60 F. Supp. 376 (S.D. Cal. 1945). O'Siochru violated this rule of navigation, resulting in Kiely's jibe, which caused Evans' injury. As Kiely admitted at trial, he was aware of Evans' position, was aware that a swinging bow could cause injury, and nevertheless swung the boom in her direction. There is no question that the defendants were negligent, as they admitted during trial.

**Comparative Negligence**

The doctrine of comparative negligence applies in Admiralty cases. In the instant case, however, there was absolutely no evidence that any negligence on the part of Evans contributed to her injury. Accordingly, the court must conclude that Evans was not at fault.

**Insurance Coverage**

As plaintiff indicated in her Pretrial Memorandum, she sought a stipulation from defense counsel that the applicable insurance policy provided coverage for the negligence of the individual defendants. The defense refused to so stipulate, so plaintiff is seeking a request for a finding of fact which will establish that the defendants were covered under the policy.

Under the insurance policy produced by the defendants in response to a request by plaintiff,[1] NCS employees are covered "for acts within the scope of their employment by

---

[1] It appears that the policy period in the policy produced by defendants is 2004-05. Plaintiff assumes that the same coverage applied in the 2002 policy.

the Named insured or while performing duties related to the conduct of the Named Insured's business".

The trial court may make findings of fact on issues that are helpful to the parties. See <u>Centricut, LLC v. Esab Group, Inc.</u>, 2003 WL 21558348 (D. N.H.), <u>rev'd on other grounds</u>, 390 F.3d 1361 (Fed. Cir. (N.H.) 2004). Although the applicability of the insurance coverage is obvious, since the defendants refused to stipulate as to the applicability of the policy, the plaintiff has sought findings of fact relating to the applicability of the policy in order to prevent any possible future issue in that regard.

The policy is applicable if the defendants were either acting in "the scope of their employment" or "while performing duties related to the conduct of Nantucket Community Sailing's business". The facts adduced at trial satisfy both of these standards. The conduct of an employee is within the scope of his employment if it is the kind of conduct he is expected to perform, if it occurs substantially within authorized time and space limits and if it is motivated, at least in part, by a purpose to serve the employer. <u>Wang Laboratories, Inc. v. Business Incentives, Inc.</u>, 398 Mass. 854 (1986). Each of these factors is satisfied in the instant case. The newspaper advertisements themselves, which advertised the Friday night functions as well as a solicitation to become a paying member of the sailing club, established that the defendants were acting, at least in part, to serve the interests of their employees. Even assuming <u>arguendo</u> that the court were somehow to conclude that defendants were not acting in the scope of their employment, it cannot be denied that they were "performing duties related to the conduct" of NCS' business. In addition to the newspaper advertisement, it was admitted at trial that the employer used the Friday night racing program to encourage interest and

participation in sailing on Nantucket and to generate business. Evans called NCS for information and was directed to the event by NCS personnel, who also invited her to buy a membership in NCS. It is beyond peradventure that O'Siochru and Kiely were performing duties "related to the conduct" of NCS' business in connection with the Friday night event.

## IV. CONCLUSION

The plaintiff respectfully requests that the court find the facts as requested herein. Specifically, the plaintiff requests that the court find that:

1. The defendants were negligent and their negligence was the proximate cause of Evans' injuries;

2. Evans was not comparatively negligent;

3. The fair and reasonable value of Evans' injuries is $2.5 Million;

4. The defendants were acting within the scope of their employment and were performing duties related to the conduct of NCS' business at the time of the incident.

WHEREFORE, the plaintiff requests that the court enter judgment for the plaintiff in the amount of $2.5 Million plus interest and costs.

Respectfully submitted,
The Plaintiff,
By Her Attorneys,

/s/ David P. Angueira
_____
Edward M. Swartz, BBO No. 489540
David P. Angueira, BBO No. 019610
Alan L. Cantor, BBO No. 072360
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
(617) 742-1900

**CERTIFICATE OF SERVICE**

I, David P. Angueira, Esq. do hereby certify that the foregoing document was served on the following counsel on this date and in the manner specified herein:

Electronically Serviced Through ECF:

Terrence Kenneally, Esq.
Clinton & Muzyka
1 Washington Mall
Boston, MA 02108

This 10th day of April, 2008.

/s/ David P. Angueira
_____
David P. Angueira